**UNITED STATES of America, Plaintiff,**

v.

**RANGER ELECTRONIC COMMUNICATIONS, INC., Defendant.**

**No. 1:96–CR–211.**

United States District Court, W.D. Michigan, Southern Division.

Aug. 24, 1998.

Gilbert & Ross, PC, New York City, for Parkside Trading and Aron Tynauer.

Samuel J. Rabin, Jr., Samuel J. Rabin, Jr., PA, Miami, FL, for CTE International SRL.

William L. Fette, Cornell, Dalzell, Fette, Ramey, et al., Kalamazoo, MI, Eric D. Isicoff, Isicoff & Ragatz, PA, David S. Mandel, David S. Mandel Law Offices, Miami, FL, for Giuseppe Coppola.

Michael J. Dunn, Grand Rapids, MI, for Joseph Albert.

Daniel Y. Mekaru, Assistant U.S. Atty, Michael H. Dettmer, U.S. Attorney, Grand Rapids, MI, for U.S.

## OPINION

ENSLEN, Chief Judge.

This matter is before the Court on Defendant Ranger Electronic Communications, Inc.'s Motion for Attorney Fees. For the reasons which follow, the Motion is granted.

### FACTS

Defendant Ranger Electronic Communications, Inc. (referred to as "Ranger Taiwan" so as to distinguish it from its related Ranger companies) has had, on the motion of the United States of America, criminal charges against it dismissed with prejudice after a jury was empaneled and sworn to try the charges. It now requests attorney fees under the Hyde Amendment, Section 617 of the Departments of Commerce, Justice and State, the Judiciary, and the Related Agencies Appropriations Act of 1998, Pub.L. No. 105–119, 111 Stat. 2440, 2519 (Nov. 26, 1997), codified at 18 U.S.C. § 3006A note. Ranger Taiwan is a foreign manufacturer of radio equipment, including Citizens Band ("CB") and amateur radios. Its equipment is exported to the United States and throughout the world. According to Jim Peng, the President and majority stock holder of Ranger Taiwan, at the time of the initial indictment Ranger Taiwan employed 145 employees and had a net worth of less than seven (7) million dollars. (Declaration of Jim Peng of July 4, 1998.) The United States has questioned whether related companies were operated separately, but offers no evidence to this effect.

Daniel R. Gravelyn, Warner, Norcross & Judd, LLP, Grand Rapids, MI, Michael C. Olson, Newport Beach, CA, for Ranger Electronic Communications, Inc., Tseng Jyi Peng and Ranger Communications (Shanghai), Inc.

James S. Brady, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for John D. Gouvian.

John M. Karafa, McNeil Grafton Law Offices, Grand Haven, MI, for Texpro Sales Canada Inc.

Howard W. Gillingham, Sharon A. Turek, Federal Public Defenders, Grand Rapids, MI, for John Somach.

Craig W. Haehnel, Haehnel & Calomeni, Grand Rapids, MI, Charles A. Ross, Brafman

On December 19, 1996, Ranger Taiwan was indicted by grand jury of this district for several crimes principally including the illegal importation of radio equipment into the United States of America in violation of 18 U.S.C. § 545. On March 27, 1997, Ranger Taiwan was re-indicted by Superseding Indictment for said crimes. The Superseding Indictment charged that a company in Niles, Michigan, A–1 Telecom Inc., had imported illegal CB radios into the United States and that Ranger Taiwan, and other Defendants, participated in the importation and laundered funds as to the sale of the radios. In this case and in three closely-related cases, no less than 17 individuals and companies were indicted. The radios in question were "prohibited by law" under the importation statute, 18 U.S.C. § 545, because of Federal Communications Commission ("FCC") regulations which require that CB radios be type accepted by the FCC. 47 C.F.R. §§ 2.803 and 95.603. The radios in question were not type accepted by the FCC and would not have been type accepted by the FCC because they broadcast on frequencies other than those approved by the FCC for CB broadcast (between 26.965 and 27.405 megahertz). *See* 47 C.F.R. §§ 95.625 and 95.655. In this regard, the radios were different from amateur radios. Under FCC regulations, amateur radios broadcast at frequencies different from the approved CB frequencies. 47 C.F.R. § 97.301. As such, the FCC does not required type-acceptance for amateur radios. 47 C.F.R. § 95.655(a). The FCC does, however, require operator licenses for amateur radio operators. 47 C.F.R. §§ 97.5–97.9. This procedure differs from that for CB radios as to which no operator license is required. 47 C.F.R. § 95.404.

Shortly before trial of Ranger Taiwan and the other Defendants, on January 9, 1998, the Court determined after legal briefing that proof of the conspiracy and illegal importation charges against the Defendants required the United States of America to prove that the Defendants knew that the law prohibited the importation of the radios imported. The Court did so after determining that the imported product was an inherently useful, non-dangerous product whose prohibited importation constituted a *malum prohibitum* rather than *malum in se* offense. Thus, the Court permitted testimony of Defendants' experts to the effect that the pertinent regulations were not understood in the electronics industry as prohibiting the imported radios when marketed as amateur radios. Just after that decision, the Court determined Ranger Taiwan's request for early disclosure of *Brady* and Jencks Act (18 U.S.C. § 3500) materials. Ranger Taiwan and other Defendants had moved the Court for early disclosure of these materials. (Dkt. No. 241.) The United States responded to the motion by promising disclosure of *Brady* and Jencks Act materials at least three days prior to trial. (Dkt. No. 275.) Based on this promise, no further relief was ordered. (Dkt. No. 285.)

Trial of the charges was commenced on January 13, 1998. The trial was hotly contested. The trial did not go as expected by the United States in that one of its chief witnesses, John Gouvian, the President of Ranger Communications Inc. ("Ranger U.S.A.") admitted during his testimony that he had knowingly lied to the United States about the contents of bank account records in order to obtain the United States' assistance in moving to quash a subpoena for the records. He did so to prevent the disclosure of the records to the Defendants on trial and to prevent his cross-examination concerning the records. When disclosed during trial, the records showed that he held a joint account with a debtor of Ranger U.S.A. and was borrowing substantial sums of money from the debtor for his personal expenses, while crediting the debtor's account with Ranger U.S.A. It is hard to imagine more important information being withheld from a defendant before trial.

Following the disclosure of this information, after a jury had been empaneled, the United States offered and some Defendants accepted a plea agreement. Under the plea agreement, some of the Defendants agreed to plead guilty to certain charges and the charges against Ranger Taiwan and Jim Peng would be dismissed in their entirety upon the recommendation of the United States. The charges against Defendant Ranger Taiwan were, thus, dismissed with

prejudice by this Court by Order of February 3, 1998 (Dkt. No. 305).

During the later sentencing of other Defendants, it was disclosed that the Ranger/A-1 Telecom indictments were nearly novel. As now indicated by the United States, prior to these related indictments, there have been only three federal prosecutions for importation of illegal CB radios—all stemming from two related cases in the Eastern District of New York. The three New York convictions resulted in probationary sentences and fines. (Dkt. No. 372 at 17.) The instant set of prosecutions has resulted in forfeitures of over one million dollars and many felony and misdemeanor convictions of defendants with no prior criminal records. It also resulted in financial hardship for the indicted companies and the loss of as many as 400 hundred jobs in the various Ranger companies. (Dkt. No. 364 at 11.)

Early in these criminal proceedings, Michael Olson, attorney for Ranger Taiwan, made several Freedom of Information Act ("FOIA") requests of the FCC relating to documents, correspondence and e-mail discussions relating to certain FCC regulations prohibiting the importation of certain kinds of 10-meter radios. By letter of August 8, 1997, the FCC answered the FOIA requests by refusing to produce some of the requested documents on the ground that production would interfere with an on-going criminal investigation and prosecution such that the documents were exempt from FOIA, 5 U.S.C. § 552(b)(7). (Defendant's Exhibit A.) The FCC came to this conclusion based in part on the coordinated review of the documents by the Assistant United States Attorney responsible for the Ranger prosecutions. (Def.'s Ex. A at 3.) Michael Olson made other FOIA requests including one dated February 6, 1998. After the dismissal and resolution of the charges against the other Defendants, the FCC wrote Olson by letter of March 30, 1998 to inform him that his February 6, 1998 request and prior requests could be answered and were fully answered by 617 pages of materials enclosed. (Def.'s Ex. B.)

Defendant has filed as exhibits a small percentage of the 617 pages of materials as evidence of withheld *Brady* materials. The materials filed include e-mail transmissions between FCC employees as to confusion about the 10-meter regulations and the need for public notices to clarify the regulations. Defendant asserts that these materials tend to prove its innocence in that it proves that there was legitimate confusion about the regulatory requirements such that it, like other members of the public, would not have realized that the radios imported were prohibited by law. The United States and the FCC engineers assert that these e-mails did not relate to the subject radios (which operated on the Citizens Band without FCC type-acceptance as required by 47 C.F.R. § 2.803 and 47 C.F.R. § 95.603), but to "modifiable" radios—*i.e.*, those radios which do not operate on Citizens Band frequencies but can be modified to do so. While the FCC engineers may have so intended by their statements, their statements are also susceptible to the interpretation that they believed that the industry and the public required greater notice of illegality as to the "open radios" (radios operating on both amateur radio and CB frequencies) marketed by the Defendant, which radios were, according to Defendant, marketed as amateur radios. Indeed, were the statements not susceptible of this interpretation and were they unrelated to the prosecution, the FCC would have had no reason to withhold the documents as to the earlier FOIA request and then disclose them after dismissal!

Two of these documents are especially telling. In Defendant's Exhibit I, there is an e-mail from Lawrence Brock (an FCC employee stationed in Dallas, Texas) to another FCC employee dated June 7, 1996. The document says in pertinent part:

As you know, the PUBLIC NOTICE went out on "Export" transceivers on May 13—many thanks to Gary.

I think now is the time to publicize it and issue warning letters to known or suspected violators. Gary has already disseminated copies of the notice at a ham convention. In the future, if we can convince AUSAs that there is no doubt that the importers/marketers knew the "export" transceivers were illegal, they may be will-

ing to take on these cases knowing that they may have to argue this point to a jury.

I've prepared a sample warning letter that we may want to send importers and wholesalers....

Before we mail any warnings, I'll provide * * * * * (the AUSA handing the A-1 case and its offshoots) with the proposed list and final draft, and determine if he has any objections or concerns relating to what he's doing. The last paragraph to the sample warning letter was added as a "just-in-case" to avoid any future conflict with anything which may be in the works.

I am also appending a sample CITATION, but I'm not recommending it. I believe the referenced sections in a formal citation indicates that it is being issued because it is required (under our Rules) prior to us issuing any administrative forfeitures, ...which may be argued, implies that they may be ignorant of the violations and should have been informed of the illegalities prior to any criminal charges. I don't believe a citation is required under our Rules for violations relating to activities for which an FCC authorization (including an equipment authorization) is required.

When the warning letters are issued, I hope Gary will be able to address questions concerning the Public Notice (especially as it relates to the Ranger and RCI models).

(Def.'s Ex. I.) This document is susceptible to the interpretation that FCC engineers at the time of the message believed that it was arguable whether regulatory violators who had imported open radios had knowingly violated the law.

Another telling document is Defendant's Exhibit L—an e-mail written from FCC employee Gary Hendrickson to Julius Knapp (another FCC employee) and apparently referencing the "Motion to Dismiss" filed by Defendants in this case. The e-mail reads in part as follows:

In your note on the transmittal slip, you made the comment that to your knowledge "none of the major brands can be modified to operate outside amateur bands—cer-

tainly not with the ease provided on the Ranger units."

Unfortunately, this isn't quite the case. Virtually all models of the major brands of "real" amateur equipment CAN be modified for out-of-band operation. This applies both to MF/HF and to VHF/UHF amateur equipment from Icom, Kenwood, Yaesu, etc. Usually, the mods require opening up the unit and removing a resistor or diode-on some, a switch which is hidden on an obscure P.C. board has to be flipped. The mods may not be quite as easy to accomplish as on the Ranger units, but we're just talking about a matter of difficulty.

The mod information is readily available in the amateur versions of the "radio mod" books. The manufacturers will tell an amateur how to do it if he provides them with a copy of his license. Many of the ham radio store's service departments will do the mods (usually upon showing of a license).

There is an exemption in the Rules which permits the use of non-type accepted equipment in the Amateur Radio Service, and for MARS and CAP use. For some strange reason, this exemption is found within the CB Rules (See 95.655(a)), rather than in Part 2! (If we're going to provide a "loophole" for manufacturers, let's be sure to place it right where they can easily find it!)....

(Def.'s Ex. L.) This document is susceptible to the interpretation that FCC engineers believed at the time of this message that the radios imported by Ranger were not legally distinguishable from modifiable radios, which radios, arguably, were not prohibited by law at the time of the criminal conduct at issue. It would have, thus, provided the Defendant an argument both that the radios imported were not "prohibited by law" and that the regulations in place did not provide adequate notice to importers that the radios were so prohibited.

These materials were not produced to the Defendant by the United States of America prior to March 30, 1998. Presuming receipt of these documents by mail took three days, *see* Fed. R.Crim. Proc. 45(e), the Defendant

received these documents on April 2, 1998. After taking some time to examine these documents, Defendant's attorney signed his Motion for Attorney Fees on June 4, 1998 and filed the same with the Court on June 11, 1998. Defendant's Motion for Attorney Fees requests attorney fees and costs in the amount of $404,737.01. The United States' response did not comment on the amount of fees requested. However, the United States' sur-reply states an objection to the fees requested, as to the hourly rate employed, the number of hours worked, and the documentation for the fees. (Dkt. No. 384 at 6.)

### LAW

Title 18 United States Code Section 3006A was amended effective November 26, 1997 by the Departments of Commerce, Justice and State, the Judiciary, and the Related Agencies Appropriations Act of 1998, Pub.L. No. 105–119, 111 Stat. 2440, 2519 (Nov. 26, 1997). Section 617 of the Act, the Hyde Amendment, provides in pertinent part as follows:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act, may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the Court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code....

111 Stat. at 2519.

This amendment's sponsor, Henry Hyde, Chairman of the House Judiciary Committee, has said that the law was necessary to curb abuses by federal prosecutors. According to Hyde,

> [Some federal prosecutions are] not just wrong, but willfully wrong, ... frivolously wrong. They [federal prosecutors] keep information from you that the law says

they must disclose.... They suborn perjury.

62 Criminal Law Reporter 1019 (Oct. 1, 1997). Thus, it is fair to say that the law was intended specifically to curb abuses associated with the bringing of frivolous indictments, the subordination of perjury and the failure to disclose exculpatory evidence. In this respect, the law holds United States Attorneys to the ideal stated by Justice Sutherland in his famous opinion in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger*, 295 U.S. at 88, 55 S.Ct. 629. *See also United States v. Payne*, 2 F.3d 706, 714 (6th Cir.1993) (following *Berger*).

As mentioned by Hyde, one of the special responsibilities of federal prosecutors is to disclose exculpatory information to criminal defendants. This basic principle of federal criminal jurisprudence was set forth by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the government to disclose information to a criminal defendant which is favorable to the defendant and material to guilt or punishment. The Supreme Court more recently explained in *Kyles v. Whitley*, 514 U.S. 419, 432–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) that this duty applies regardless of the good or bad faith of the prosecution and regardless of

whether a specific request for the information was made. The Supreme Court also said that information's materiality is determined not by "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555. While the Supreme Court instructed that a *Brady* violation may be found even if the evidence is sufficient to convict, *id.* at 434, 115 S.Ct. 1555, it also instructed that in considering a *Brady* challenge the courts should view the evidence collectively and not simply item-by-item. *Id.* at 436, 115 S.Ct. 1555. *See also United States v. Frost,* 125 F.3d 346, 382–83 (6th Cir.1997) (adopting above interpretation of *Brady* ).

■ In adopting the Hyde Amendment, Congress made criminal fee requests subject to the procedures and limitations utilized by civil litigants under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. The EAJA permits fees to a prevailing corporation only if the organization's net-worth does not exceed 7 million dollars and the organization had less than 500 employees at the time the action was filed. The EAJA limits fee applicants to attorney fees at the rate of $125/hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). The EAJA also requires attorneys to make an application for fees "within 30 days of final judgment ...." 28 U.S.C. § 2412(d)(1)(B). The term " 'final judgment' means a judgment that is final and not appealable, and includes an order of settlement[.]" 28 U.S.C. § 2412(d)(2)(G). The time limitation has been construed as a jurisdictional limitation for the filing of an application for attorney fees. *Peters v. Secretary of Health and Human Services,* 934 F.2d 693, 694 (6th Cir.1991); *Allen v. Secretary of Health & Human Services,* 781 F.2d 92, 94 (6th Cir.1986). One consequence of this jurisdictional limitation is that the 30–day time period is not ordinarily subject to equitable tolling. *Clifton v. Heckler,* 755 F.2d 1138, 1144–45 (5th Cir.1985); *Epling v. United*

*States,* 958 F.Supp. 312, 315 n. 1 (W.D.Ky. 1997); *United States v. Lindert,* 142 F.3d 437, 1998 WL 180519 (6th Cir. April 8, 1998) (unpublished). This jurisdictional limitation is especially fatal to claims for attorney fees in criminal actions because the EAJA waiver of sovereign immunity as to other fee statutes and under the common law applies only to civil and not criminal actions. *See* 28 U.S.C. § 2412(b). For this reason, and because Federal Rule of Criminal Procedure 16 does not expressly permit monetary sanctions against the United States, at least one federal court prior to the enactment of the Hyde Amendment forbade awards of attorney fees as relief for discovery abuses in criminal actions. *United States v. Horn,* 29 F.3d 754 (1st Cir.1994).

■ In the typical civil case justifying an EAJA award, final judgment is not reached until either a settlement resolving all claims is reached and ordered or all claims in the lawsuit are fully and finally litigated through appeal. This conclusion follows in part from federal practice under Federal Rule of Civil Procedure 54, which usually makes determinations of civil claims non-appealable until such time as all claims are decided. Fed. R. Civ. Proc. 54(b). After a final judgment within the meaning of Rule 54 is entered, the matter will become non-appealable either through exhaustion of the appeal process or through expiration of the time for appeal. Once the time for appeal expires, a moving party will have the statutory 30 days to file an application for attorney fees. *Melkonyan v. Sullivan,* 501 U.S. 89, 96, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). In other words, the 30–day period begins to run as soon as the judgment is no longer appealable. *Shalala v. Schaefer,* 509 U.S. 292, 302, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).

■ Nevertheless, EAJA time limitation works differently in criminal cases. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution prevents the United States from twice placing a criminal defendant in jeopardy for the same offense. *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *Ball v. United States,* 163 U.S. 662,

669, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). The United States may not appeal a dismissal of an indictment when further prosecution is barred by a defendant's right against double jeopardy. 18 U.S.C. § 3731. Once a criminal jury is empaneled and sworn, jeopardy attaches. *Serfass v. United States*, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); *Crist v. Bretz*, 437 U.S. 28, 34–36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); *Downum*, 372 U.S. at 737–38, 83 S.Ct. 1033. After jeopardy attaches and the prosecution terminates, with certain exceptions not applicable here (*e.g.*, failure of jurors to seasonably agree, mistrial caused by "manifest necessity" and *etc.*), further prosecution on the charges is barred. *Crist*, 437 at 34–36, 98 S.Ct. 2156; *Downum*, 372 U.S. at 737, 83 S.Ct. 1033. The United States Supreme Court held in *Crist* that a prosecutor's dismissal of criminal charges after jeopardy had attached prevented further prosecution. The Supreme Court held in *Downum* that a judge's discharge of a jury because of the unavailability of a prosecution witness also prevented further prosecution. Thus, under the Hyde amendment and the EAJA, the dismissal of charges against a defendant after jeopardy has attached begins the 30–day limitation period since the dismissal is nonappealable as of the date of dismissal.

■ With these general principles in mind, there is no federal precedent as to the interpretation of the EAJA limitation of the Hyde Amendment. In particular, there is no precedent as to how the EAJA limitation period should apply in a case when the United States' bad faith is the concealment of exculpatory evidence and the exculpatory evidence is not revealed until after the expiration of the 30–day limitation period. A strict reading of the EAJA limitation in this context would preclude recovery. However, such a reading—that the United States can avoid liability by compounding its wrong—is diametrically opposed to the purposes of Henry Hyde in offering this legislation and would convert the law into an empty legislative promise. The legislative history of the Amendment supports the creation of a limited extension of the application period in such a circumstance. This is because the legislature history recognized that the withholding

of *Brady* materials sometimes occurs and that when it occurs it, absent a delay attributable to a defendant, it should be punished. This conclusion is buttressed by general principles of statutory interpretation. Among these principles are the principles that all statutes should be read fully and interpreted judiciously rather than mechanically, *Connecticut National Bank v. Germain*, 503 U.S. 249, 255 n. 1, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (concurring opinion of Justice Stevens); and that remedial statutes should be interpreted in accordance with their remedial purposes, *County of Washington v. Gunther*, 452 U.S. 161, 178, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). The "cardinal principle of statutory construction is to save and not to destroy." *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937). For this reason, the law favors those statutory interpretations which give effect to every word of the statute. *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *United States v. Page*, 131 F.3d 1173, 1180 (6th Cir.1997). In order to give effect to Congress' purpose and words in awarding attorneys fees in criminal cases involving "bad faith" where the United States conceals its bad faith until more than 30 days after entry of judgment, a further reasonable time period should be permitted for the filing of an application for attorney fees.

Regardless of the application of the above fee-shifting statute, the Court has an obligation to enforce ethical rules as to attorneys including federal prosecutors. W.D. Michigan Local Rule of Criminal Practice and Procedure 57(j)-(k). Under said Rule, federal prosecutors are governed by the Michigan Rules of Professional Conduct especially including Rule 3.8, Special Responsibilities of a Prosecutor, when practicing in this Court. Rule 3.8(d) of the Michigan Rules of Professional Conduct provides that a prosecutor in a criminal case shall "make timely disclosure to the defense of all evidence of information known to the prosecutor that tends to negate the guilt of the accused..." Where there are apparent violations of law and/or the standards of professional conduct by Assistant United States Attorneys, the United States

Supreme Court and lower courts have recommended referral for investigation and discipline by the Department of Justice Office of Professional Responsibility. *United States v. Hasting,* 461 U.S. 499, 506 n. 5, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *United States v. Bernal–Obeso,* 989 F.2d 331, 333 n. 2 (9th Cir.1993).

### LEGAL ANALYSIS

■ Upon review of the matter, the Court determines that the moving party, Ranger Taiwan, is a "party" within the meaning of the EAJA, 28 U.S.C. § 2412(d)(2)(B), and a "prevailing party" within the meaning of the EAJA and the Hyde Amendment, 28 U.S.C. § 2412(d)(2)(H) and 18 U.S.C. § 3006A note.

■ Upon review of the alleged misconduct, the Court determines that the conduct of the Assistant United States Attorney assigned this matter violated his obligations to share exculpatory information under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and constituted "bad faith" within the meaning of the Hyde Amendment. The Court also determines that there are no "special circumstances" which would make an award of fees unjust. The guilt of other related companies is not under this set of facts a "special circumstance" which makes an award of fees unjust nor does it deprive the Defendant of the presumption of innocence that attends a binding dismissal after the empaneling of a jury.

■ Based on the timing of events in this suit, the Court determines that the application for fees was filed more than thirty (30) days after the entry of the order dismissing the criminal charges against the Defendant, which dismissal constituted "final judgment" under the EAJA and the Hyde Amendment. This delay was not due to the fault of the Defendant in that the documents revealing the *Brady* violation were not disclosed until the expiration of the 30–day limitation period. The documents disclosed were numerous and at the time of disclosure were not expected to reveal *Brady* violations. Therefore, the Court determines that the Defendant was permitted under the statute a rea-sonable period of time to discover the *Brady* violation from the documents and to file its application for attorney fees under the EAJA. The Court determines that, as such, the application was timely filed.

Because the United States has made a late objection to the amount of fees by raising the issue in its sur-reply brief, the Court has not received complete briefing as to the amount of attorney fees which should be assessed under the Hyde Amendment. The Court will permit further briefing from the parties before determining the amount of fees due.

Finally, the obligation of the Court to enforce its ethical standards in federal prosecutions requires this Court to order the Assistant United States Attorney involved to appear before this Court to show cause why the allegations made here should not be referred to the Office of Professional Responsibility of the Department of Justice for investigation pursuant to 28 C.F.R. § 0.39.a.

### CONCLUSION

Accordingly, for the reasons stated, an order shall issue granting the Motion for Attorney Fees but ordering further briefing to determine the amount of fees. An order to show cause shall also issue and shall require the Assistant United States Attorney to show cause why a formal investigation before the Office of Professional Responsibility of the Department of Justice should not be commenced.

### ORDER TO SHOW CAUSE

In accordance with the Court's Opinion of this date;

**IT IS HEREBY ORDERED** that the Assistant United States Attorney assigned this matter shall appear before this Court on Thursday, September 10, 1998 at 10:00 a.m. to show cause why the allegations made here should not be referred to the Office of Professional Responsibility of the United States Department of Justice for investigation. The Assistant United States Attorney is advised to obtain counsel for said hearing.

**IT IS FURTHER ORDERED** that either attorney Michael Olson or attorney Daniel Gravelyn shall be present at said hearing to

present evidence concerning the withholding of *Brady* materials by the Assistant United States Attorney.

### ORDER

In accordance with the Court's Opinion of this date;

**IT IS HEREBY ORDERED** that Defendant Ranger Electronic Communications, Inc.'s Motion for Attorney Fees (Dkt. No. 364) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Defendant shall file a supplementary brief and affidavits within fourteen (14) days indicating the amount of attorney fees requested, the hourly rate requested and the number of hours expended representing the Defendant in this litigation. Defendant's supplementary brief shall also explain whether and why an hourly rate in excess of the $125/hour EAJA rate is requested and shall attach any necessary documentation for the fees requested. Plaintiff may respond to the supplementary brief within fourteen (14) days of its filing.