**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Filemon BERNAL–OBESO,**
**Defendant–Appellant.**

**No. 91–50796.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1992.

Decided March 29, 1993.

Sara A. Rapport, Federal Defenders of San Diego, Inc., San Diego, CA, for defendant-appellant.

John Rice, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: WALLACE, TROTT, and T.G. NELSON, Circuit Judges.

TROTT, Circuit Judge:

Filemon Bernal–Obeso appeals his conviction by a jury of conspiracy to possess a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession of a controlled substance with intent to distribute and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. His primary complaint on appeal is in two parts. First, he alleges that during the discovery phase of his case he was prevented from pursuing information suggesting that a key informant-witness had lied about his criminal record to the Drug Enforcement Administration. Second, he contends he was denied by the trial court the opportunity to confront that informant-witness on cross examination with the

same information. The government asks us, only for the purpose of deciding this appeal, to assume error in denying the defendant access to and use at trial of this information, but to affirm nevertheless on the ground that the supposed error was harmless beyond a reasonable doubt. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291 (1988). We vacate the defendant's conviction and remand for a hearing on the nature and admissibility of the disputed evidence. This panel shall retain appellate jurisdiction over this matter should it come back to the Court of Appeals.

## I

Bernal–Obeso's conviction was based in large measure on the testimony of a confidential informant named Cabrera–Diaz. Cabrera–Diaz, a Mexican citizen, had worked undercover for the Drug Enforcement Administration (DEA) for three to four years and was instrumental in the investigation resulting in Bernal–Obeso's conviction. For his work related to this case, Cabrera–Diaz was paid (1) $1,000 on the day Bernal–Obeso was arrested, (2) $1,000 a few days later when debriefed by the government, and (3) $10,000 shortly before the appellant's indictment. Cabrera–Diaz's relationship with the DEA also permitted him to travel freely throughout the United States for the DEA, even though he had only a border crossing card.

The trouble leading to this appeal started when the government responded late to a defense pretrial discovery request for information about Cabrera–Diaz. The government was under a court order predicated on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to provide to the defense by a specific date all pertinent information about the informant. Five days late, and only five days before the trial was scheduled to begin, the government advised the defense in a written memorandum that Cabrera–Diaz had killed two people in 1982, but had not been charged with any crimes pertaining to their

deaths. Shortly thereafter, defense counsel advised the court that this information was not accurate and that criminal charges had in fact been filed against Cabrera–Diaz. Defense counsel requested a continuance to explore this discrepancy, but the request was denied. Two days later, immediately before the trial began, defense counsel renewed his motion for a continuance, advising the court that the government's memorandum was wrong in almost all respects: (1) Cabrera–Diaz had been charged with two counts of murder and two counts of attempted murder for his involvement in the 1982 killings; (2) he had not raised a claim of self-defense; and (3) he had pleaded guilty to two felony counts of voluntary manslaughter with a firearm enhancement. In addition to the renewed request for a continuance to explore the implications of these discrepancies between the facts and the government's tardy memorandum, defense counsel requested a preliminary ruling from the court allowing him to attempt to impeach Cabrera–Diaz with what counsel believed were lies to the DEA concerning his prior record. Both requests were denied. The court permitted impeachment of the informant with his prior manslaughter convictions, but allowed no questions about the possibility of lies to the DEA.

■ The vexing hitch in this case is that the government has created the impression that Cabrera–Diaz lied to the DEA before the trial about his impeachable criminal history. The difference between the government's memorandum regarding Cabrera–Diaz's criminal history and the facts relating to his pleas of guilty to manslaughter is responsible for this impression. As the government admits in its brief, "Certainly there was a breakdown in communication at some point and the Government did not provide defense counsel with the correct information regarding the [confidential informant's] prior record." Under the circumstances, if there is or was an innocent explanation for this "false impression," as the government now claims,[1]

---

**1.** In its brief, the government says, "However, it is incorrect to conclude that the CI lied to the

agent about his prior record in light of the fact that the CI obviously provided the agent with

the government should have promptly rectified this lapse on its own initiative before trial started. The government's failure to set the record straight is partially excused only by its forthright admission at oral argument that it made a mistake by not clearing up this matter when it became an issue. Nevertheless, we, like the defense, are left with a record from which we cannot determine whether the informant lied to the DEA about his prior felony convictions, or whether this is just a case of sinless miscommunication. In this connection, the government, although disclaiming any wrongdoing, asks us in essence to assume for the sake of deciding the appeal that the informant lied, and then decide whether the Confrontation Clause error that this assumption necessarily creates was harmless beyond a reasonable doubt. The government, of course, argues the error was harmless. We decline to follow that course, because it is simply too conjectural and speculative. We believe the better course is to flush out the truth from behind the government's veil and then determine what to do with it in the light of its implications, if any, with respect to Cabrera–Diaz's credibility. Moreover, the government should be required under these circumstances, for prophylactic reasons at least, to demonstrate whether it discharged its obligation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio* to provide the defense with material exculpatory evidence within the government's possession, including evidence that could have been used to impeach the informant's credibility.[2] On this important issue, the record is silent. If the government did know about the witness's prior felony convictions, why did it not so advise the defense? This is an issue of too many questions and not enough answers. Moreover, we may be dealing with the "tip of an iceberg" of other evidence that should have been revealed. *United States v. Shaffer,*

789 F.2d 682, 690 (9th Cir.1986) (quoting *United States v. Griggs,* 713 F.2d 672, 674 (11th Cir.1983) (remanding for an *in camera* hearing to review the prosecutor's files for additional exculpatory materials)). Thus, resolution of this matter is best served by the light of a hearing, not the darkness of an assumption on appeal.

## II

■ The use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril. This hazard is a matter "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and thus of which we can take judicial notice. Fed.R.Evid. 201(b)(2); *cf. Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984) (illegal activities of prisoners subject to judicial notice). By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom. As Justice Jackson said forty years ago, "The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee v. United States,* 343 U.S. 747, 757, 72 S.Ct. 967, 973, 96 L.Ed. 1270 (1952). A prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system. *See United States v. Wallach,* 935 F.2d 445 (2d Cir.1991) (convictions reversed because government should have known witness was committing perjury). Because the government decides whether and when to use such witnesses, and what, if anything, to give them for their service, the govern-

---

his correct name and the fact that he had been involved in a killing in 1982. If the CI or the Government were purposefully attempting to mislead appellant about the CI's prior record, they would not have provided any information regarding the 1982 incident."

2. The United States Department of Justice maintains an Office of Professional Responsibility. That office is empowered to take appropriate action should a *Brady* violation come to light. *See* 28 C.F.R. § 0.39–0.39e (1992).

ment stands uniquely positioned to guard against perfidy. By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility. *Shaffer*, 789 F.2d at 689.

Our judicial history is speckled with cases where informants falsely pointed the finger of guilt at suspects and defendants, creating the risk of sending innocent persons to prison. As an example from our own circuit, one need only recall the widely publicized Leslie Vernon White saga in Los Angeles, California, which resulted in the reinvestigation of over 100 felony cases by the Office of the District Attorney of Los Angeles County involving alleged jailhouse confessions brought to the attention of the authorities by cellmates. White, a frequent witness for state prosecutors, is now in state prison for perjury. The White revelations also triggered an investigation of the use of such informants by the Los Angeles County Grand Jury which issued an eye-opening report on June 26, 1990. In this report, the Grand Jury makes this telling observation:

> Informants do not tend to follow mores. According to one informant, "in the old days" informants abided by a rule not to act as an informant against other informants, but presently informants "will even book their own mother."
>
> This disinclination to follow societal rules extends to their willingness to defile an oath. Informants testified before the Grand Jury to repeated instances of perjury and providing false information to law enforcement. With one exception, each informant who testified claimed he himself had committed perjury or provided false information incriminating another inmate one or more times.

Report of the 1989–90 Los Angeles County Grand Jury, June 26, 1990, at 16. *See also* Mark Thompson, *The Truth About the Lies*, Cal.Law., Feb. 1989, at 15; Mark Curriden, *No Honor Among Thieves*, A.B.A. J., June 1989, at 52.

Criminals caught in our system understand they can mitigate their own problems with the law by becoming a witness against someone else. Some of these informants will stop at nothing to maneuver themselves into a position where they have something to sell. It is no accident that some federal jury instructions regarding an immunized witness warn jurors that such a witness "has a motive to falsify." *United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1574–1575 (9th Cir.1989), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). A pattern jury instruction puts it this way:

ACCOMPLICE–INFORMER–IMMUNITY

> The testimony of some witnesses must be considered with more caution than the testimony of other witnesses.
>
> For example, a paid informer, or a witness who has been promised that he or she will not be charged or prosecuted, or a witness who hopes to gain more favorable treatment in his or her own case, may have a reason to make a false statement because he wants to strike a good bargain with the Government.
>
> So, while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

Pattern Jury Instructions of the District Judges Association of the Eleventh Circuit, Criminal Cases, Special Instruction No. 1.1 (1985). The searing fires of experience have forged these wise admonitions. *See also* Edward J. Devitt, Charles B. Blackmar, Michael A. Wolff and Kevin F. O'Malley, Fed.Jury Prac. & Instr., 476–509 (1992).

It is also true, however, that our criminal justice system could not adequately function without information provided by informants and without their sworn testimony in certain cases. This need is created by our rules permitting persons accused of

crime to confront the witnesses against them, measures that elevate the hearsay rule to Constitutional dimensions. Moreover, it is a well-known phenomena that the higher-ups in criminal enterprises attempt to insulate themselves from detection and exposure by having their unlawful schemes carried out by others. Without informants, law enforcement authorities would be unable to penetrate and destroy organized crime syndicates, drug trafficking cartels, bank frauds, telephone solicitation scams, public corruption, terrorist gangs, money launderers, espionage rings, and the likes. In the words of Judge Learned Hand, "Courts have countenanced the use of informers from time immemorial; in cases of conspiracy, or in other cases when the crime consists of preparing for another crime, it is usually necessary to rely upon them or upon accomplices because the criminals will almost certainly proceed covertly." *United States v. Dennis*, 183 F.2d 201, 224 (2d Cir.1950), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); *On Lee v. United States*, 343 U.S. at 756, 72 S.Ct. at 973 ("Certainly no one would foreclose the turning of state's evidence by denizens of the underworld."). Innumerable important convictions have been appropriately attained using informants' testimony.

Thus, we have decided on balance not to prohibit, as some have suggested, the practice of rewarding self-confessed criminals for their cooperation, or to outlaw the testimony in court of those who receive something in return for their testimony. Instead, we have chosen to rely on (1) the integrity of government agents and prosecutors not to introduce untrustworthy evidence into the system, *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); (2) trial judges and stringent discovery rules to subject the process to close scrutiny, *United States v. Heath*, 260 F.2d 623, 626 (9th Cir.1958); (3) defense counsel to test such evidence with vigorous cross examination, *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) ("Cross examination is the principle means by which the believability of a witness and the truth of his testimony are tested."), *United States v. Butler*, 567 F.2d 885, 890 (9th Cir.1978); and (4) the wisdom of a properly instructed jury whose duty it is to assess each witness's credibility and not to convict unless persuaded beyond a reasonable doubt of the accused's guilt. *On Lee v. United States*, 343 U.S. at 757, 72 S.Ct. at 973. To quote the Supreme Court, "The established safeguards of the Anglo–American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311–12, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966); *see also United States v. Cervantes–Pacheco*, 826 F.2d 310, 315 (5th Cir.1987), *cert. denied sub nom Nelson v. United States*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988) ("[A]n informant who is promised a contingent fee by the government is not disqualified from testifying in a federal criminal trial.") Because we have made this choice, it is essential that relevant evidence bearing on the credibility of an informant-witness be timely revealed (1) to defense counsel as required by *Giglio*, and (2) to the ultimate trier of fact, unless clearly cumulative or attenuated. *See* Fed.R.Evid. 403; *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination....")

Turning to the present case, we simply do not know what it is that floats menacingly into our waters. The unseen part of the iceberg as to Cabrera–Diaz's credibility may be benign, or it may spell trouble for the government's case. It is clear in the abstract, however, that a lie to the authorities paying for his services by an informant-witness about his felony criminal record would be relevant evidence as to the informant's credibility. *See* Fed.R.Evid. 608(b). The usefulness of an informant as a witness depends in large measure on the degree to which he both is and can be presented to a fact finder as a reliable

person. As any trial lawyer knows, felony convictions trench heavily upon such a person's credibility. Prior felony convictions frequently convince defense attorneys not to call their clients to the witness stand for fear that a jury might be swayed by such a background to disregard the defendant's testimony. Prosecutors confront the same problem in evaluating the usefulness of an informant as a witness: a serious felony record could cause a jury completely to disregard his testimony and possibly to conclude from it that the government's entire case is suspect. For reasons not yet brought to the light of day, the government did not bring the existence of Cabrera–Diaz's felony convictions to the attention of the defense; the defense discovered the convictions on its own initiative.

■ Moreover, an informant who attempted to conceal his felony criminal record either from an investigating agency or a prosecutor could well be seen by a jury as someone whose testimony should be flatly rejected. If he would lie to the DEA to get his well-paying job, why would he not lie to a jury about the activities of his quarry to keep it, or so goes the argument. This is especially true of an informant such as Cabrera–Diaz who appears from the record to have been on the payroll of the DEA, as compared to someone only involved in a single case or episode. To demonstrate this point, we need look no farther than Cabrera–Diaz's answers on cross-examination:

Q. And you've come to learn that the more information you give them the more money you can make?

A. Yes.

Q. You've come to learn that the bigger the case the more money you're able to make?

A. Well, yes.

Q. The more drugs, the more money?

A. Yes.

Q. The more people, the more money?

A. Yes.

As the government conceded at oral argument, such a material lie by a critical informant-witness about his prior record would be exculpatory and thus discoverable Brady information which the government would be under a Constitutional duty to disclose. Evidence of such a lie might be equivalent to the proverbial smoking gun. All the other evidence used by the defense to punch holes in Cabrera–Diaz's credibility amounted only to circumstantial reasons why Cabrera–Diaz might alter the truth to continue to feather his own nest. A lie would be direct proof of this concern, eliminating the need for inferences. *See United States v. Brumel–Alvarez,* 976 F.2d 1235, 1244 (9th Cir.1992) ("Evidence that [the informant] lied during the investigation ... would be relevant to his credibility and the jury was entitled to know of it.").

## III

Ordinarily, "we review the district court's limitation on the extent of the cross-examination for an abuse of discretion." *United States v. Guthrie,* 931 F.2d 564, 568 (9th Cir.1991). Because neither we nor the trial court know what it is we are attempting to review, however, we cannot fulfill this responsibility on this record. Notwithstanding the government's liability for this quandary, we will not presume under these circumstances that the government has intentionally deprived the defendant of evidence that would erode the informant's credibility. On the other hand, we will not assume an innocent explanation from a silent record. The appropriate step is to vacate the defendant's conviction and remand to the district court for an evidentiary hearing to determine what happened and why, with respect to the government's miscommunication to the defense about Cabrera–Diaz's criminal record. *See United States v. Kiser,* 716 F.2d 1268, 1274 (9th Cir.1983) (vacating conviction and remanding for an evidentiary hearing on the identity of an informant); *United States v. Davis,* 663 F.2d 824, 830–31 (9th Cir.1981). The government should welcome this opportunity to clear the air.

Our intent in ordering an evidentiary hearing is to restore the parties to the position in which they found themselves pretrial, but with counsel for the defendant and the court fully enlightened as to the

facts surrounding the issue of Cabrera–Diaz's communications with the government, if any, about his felony record. In that posture, the court shall determine under the usual standards if admissible evidence exists in connection with Cabrera–Diaz's behavior that would impeach his credibility. *See* Fed.R.Evid. 608(b). If the court determines that "a threshold level of evidence [exists] to show that the defendant's allegations of misconduct have some grounding in reality," *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir.1984), the court shall order a new trial. To avoid this outcome, in essence the government shall have to demonstrate to the satisfaction of the court that there is no grounding in reality for the claim that Cabrera–Diaz lied. This procedure should most closely approximate the manner in which the decision regarding admissibility should have been made in the first place. If the court determines that a new trial is not in order, the court may reinstate the judgment of conviction. *Kiser*, 716 F.2d at 1274. Should the court uncover egregious wrongdoing by the government, however, nothing in this opinion forecloses consideration by the court of dismissing the indictment for outrageous government conduct. *See United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991),[3] *United States v. Barrera–Moreno*, 951 F.2d 1089 (9th Cir.1991). This panel retains appellate jurisdiction over this matter.

VACATED and REMANDED.

---

**3.** Bernal–Obeso raises other issues pertaining to (1) the exclusion of evidence explaining why he could afford two motel rooms on the evening of May 30, and (2) statements by the prosecutor during closing argument regarding his economic status. We have examined his contentions in this regard and conclude they have no merit.