831 A.2d 501

Tony **WILLIAMS**

v.

**STATE of Maryland.**

No. 2161, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Sept. 4, 2003.

Fred Warren Bennett, Robert W. Biddle (Bennett & Biddle, L.L.P., on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.,on brief), Baltimore, for appellee.

Argued before SONNER, THEODORE G. BLOOM (Retired, specially assigned) and PAMELA L. NORTH (Specially assigned), JJ.

BLOOM, J.

In this case, we are called upon to decide the extent of, or limits on, a prosecutor's duty to inform a defendant of impeachment evidence, in accordance with *Brady v. Maryland,*

373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). On 24 May 2001, Tony Williams, appellant, filed a petition for post conviction relief, in which he contended that at his trial for murder the State of Maryland, appellee, failed to disclose material impeachment evidence regarding the State's principal witness, a jailhouse snitch. Appellant maintained that the State's violation of *Brady, supra,* entitled him to a new trial.

In the spring of 1998, appellant was charged with the first and second degree murder of Dana Rochelle Drake (the "victim"), with using a handgun in the commission of a crime of violence, and with wearing, carrying, or transporting a handgun. Following a trial in the Circuit Court for Baltimore City, held 2 February 1999 through 10 February 1999 (Cannon, J. presiding), appellant was convicted on all counts. On 21 April 1999, after the lesser included offenses were merged, appellant was sentenced to life imprisonment for the murder and an additional twenty year term for the handgun violation.

During the trial, the State proved that on 21 February 1998, Drake was fatally shot outside of her apartment complex in northeast Baltimore. There was no forensic evidence connecting appellant to the murder. The State relied heavily on the testimony of Sean Williams,[1] a jailhouse snitch, who testified that appellant confessed to the murder while the two were incarcerated together.

Following his conviction and review of sentence by a three-judge panel in the circuit court, appellant appealed his conviction to this Court on the limited ground of sufficiency of the evidence. In an unpublished opinion filed 23 March 2000, we affirmed, concluding that the State's evidence was sufficient to support appellant's conviction. *Williams v. State,* No. 765, Sept. Term 1999 (filed March 23, 2000), *cert. denied,* 359 Md. 330 (2000).

---

1. Appellant and Sean Williams are not related. Throughout this opinion, we shall refer to Tony Williams as appellant and Sean Williams simply as Williams.

Thereafter, on 24 May 2001, appellant filed the post conviction petition. On 1 and 2 May, 17 July, and 26 August 2002, the court (Waxter, Jr., J. presiding), held hearings on appellant's petition. By its Memorandum Opinion dated 24 September 2002, the court denied appellant's request for post conviction relief, ruling that there had been no *Brady* violation. By its Order and Supplemental Opinion, dated 9 October 2002, the court subsequently denied appellant's motion to alter or amend the court's judgment.

In this appeal from the denial of his post conviction petition, appellant presents two interrelated questions for our review:

I. Did the circuit court err in absolving the State of any duty to disclose exculpatory impeachment information where police officers and an Assistant State's Attorney knew of the exculpatory impeachment information but did not convey that information to the police officers and prosecutor assigned to prosecute Appellant?

II. Is there a substantial possibility that the exculpatory impeachment information withheld by the State would, if properly disclosed, have affected the jury's verdict, thus requiring a new trial?

In its brief, the State frames the question as follows:

I. Did the State not withhold material evidence favorable to Williams in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)?

For the reasons that follow, we shall reverse and remand for a new trial.

### FACTUAL SUMMARY[2]

### A. Facts Pertinent to Trial

The victim died as a result of a gunshot wound to her head and another gunshot wound to her back, incurred following her return home from a social event. The police discovered

---

**2.** We take much of our recitation of the substantive facts from our decision in *Williams I. See Williams I, supra,* slip op. at 1–6.

her body at approximately 4:30 a.m. on the morning of 21 February 1998, after responding to a call from appellant about the shooting. Officer Richard Gibson of the Baltimore City Police Department, Northern District, testified that, at approximately 4:30 a.m., he met appellant at a pay phone outside a bar in the 5900 block of York Road. Gibson then followed appellant's red Corvette to an apartment building on Marjorie Lane.

After appellant informed Gibson that the victim's body was located inside the building, Gibson discovered the victim, lying in a "pool of blood" in the stairwell. She had no pulse.

After other officers arrived to secure the crime scene, Gibson returned to appellant. Appellant told Gibson that he and the victim had previously been romantically involved, but were not currently involved. He also said that the victim's new boyfriend had threatened to kill her. Gibson recalled that appellant's demeanor was "very calm, very polite," and "very cooperative." Moreover, he stated that appellant did not seem sad or unhappy, did not inquire as to whether the victim was still alive, and did not inquire as to how she had been hurt. Gibson also testified that appellant did not ask about either the victim or appellant's daughter.

The victim's friends and relatives testified at trial as to her relationship with appellant. According to Wanda Drake, the victim's sister, the victim and appellant were engaged in June or July of 1997, and the victim wore an engagement ring for approximately two months. Thereafter, she returned the ring to appellant to be sized. The victim's sister further explained that she last spoke with the victim on 20 February 1998 at "about 7:00, 7:30." The victim had told her sister that she was going to a disco that night and planned to shop for a dinette set the next morning. The victim's sister recalled receiving a telephone call "around four-thirty" the next morning from appellant, who told her to "come get my sister" and to call 911. Thereafter, the victim's sister and appellant had a three-way conversation with 911. At that time, the victim's sister

learned that appellant had already contacted the police, saying that his fiancée was hurt.

During Drake's testimony, a tape of the 911 call was admitted into evidence. A transcript of the tape was distributed to the jury for demonstrative purposes. During the 911 call, appellant stated that his "girlfriend just got shot" "in our apartment complex." When asked for the address, appellant claimed: "I just moved in with her" and "I don't know the address." The victim's sister testified, however, that after completing the three-way call to 911, she and appellant continued speaking on the phone, and appellant gave her directions to the victim's apartment within "a couple of minutes."

Michelle Hall, the victim's co-worker, testified that she talked with the victim on the telephone at approximately "eight, eight-thirty" on the night of 20 February 1998, to discuss their attire for the party that evening. The victim told Hall that appellant wanted to attend the party, at which time appellant and Hall discussed the arrangements on the phone. According to Hall, however, appellant did not appear at the event.[3] Hall recalled that appellant took her home after the party.

Teresa Clark, a friend of appellant's who had attended the party, confirmed that the victim was engaged to appellant sometime in 1997, but that she had returned the ring to appellant shortly thereafter to be properly sized. Clark recalled that she did not see the victim wear the ring to work again.

David Morgan testified that he had also dated the victim and described their relationship as one that was "off and on ... very close." He denied that he and the victim were ever "girlfriend boyfriend." Morgan said he was unaware that the victim had ever been engaged; but recalled that appellant followed him on numerous occasions and questioned him about

---

3. Curtis Burk, a long-time friend of the victim, testified that, while speaking to the victim at the party, he observed appellant "standing like in the back of the building over there near like a coat rack area."

his relationship with the victim. Morgan said that his relationship with the victim ended sometime in the summer of 1997. Morgan's new girlfriend, Jannella Stafford, testified that she was with Morgan at his home on 21 February 1998, from approximately 1:30 a.m. until approximately 6:45 a.m.

Morgan explained that after the victim's death he was informed by a friend that he was a suspect in the case. As a result, Morgan went to the police station to give a formal statement. As Morgan put it, he gave the statement in order to "clear my name."

Two neighbors living in the victim's apartment building also testified at appellant's trial. Shannond Fair explained that he was awakened by a woman's scream, then the sound of two or three gunshots, at approximately 2:00 a.m. or 3:00 a.m. Fair recalled that he looked out of the window and saw a man run from the building and up the street. He was unable, however, to identify the man "facially," but stated that he "knew the person had on dark clothing." On cross-examination, Fair stated that, in a statement to a private investigator hired by defense counsel taken within three months of the shooting, he had said: "All I saw was a male, dark complexion, wearing all black that could have been anyone...."

Another neighbor, Brenda O'Carroll, who lived one floor below the victim, recollected hearing two separate sets of gunshots. According to O'Carroll, the first set of shots was fired outside the apartment building. O'Carroll testified, "Then the front door [to the apartment building] opened and someone came in and then the door opened upstairs and then the door opened again and somebody was coming downstairs...." She then heard a man "having words" with a woman. Thereafter, she heard a second set of shots from the hallway, followed by a faint knocking at her door. She further testified that she saw appellant, whom she recognized from speaking with him that same afternoon, jump into a car and "then he rode out like Speedy Gonzales." Upon opening the door to her apartment "[about] fifteen minutes" after hearing the shots from the hallway, O'Carroll found the victim.

On cross-examination, O'Carroll testified that she heard "two [shots] outside, ten minutes goes by, and ... one [shot] inside." Moreover, although she admitted that she could not see appellant shooting at the victim outside, O'Carroll stated that she saw the victim park her car and appellant pull his car over to the side of the road, across the street. Thereafter, she saw the victim "running trying to get away" and appellant "running after her" shooting two shots. She also testified, however, that she only got "up out of the bed" after hearing the argument ensuing in the foyer of the building, which, according to O'Carroll's testimony, occurred only after the shooting outside.

Charles Frank, a part time gun dealer at Valley Gun on Harford Road,[4] testified that he delivered a .22 caliber handgun to appellant on 15 February 1998. Scientific evidence established that the cartridge casings found at the crime scene did not have appellant's fingerprints on them. Moreover, although appellant informed police that he had fired his gun earlier that day, no gunshot residue was found on his hands.

Appellant's fiancée at the time of trial, Terri Whittaker, also testified for the State. She explained that she and appellant had dated since 1996 and got engaged in December of 1997; they planned a wedding for May of 1999. She stated that they had "broken up" in January 1998, although she testified that, as of the time of trial, she still considered herself "his fiancée."

II.  According to Whittaker, as of "somewhere between October and November" of 1997, appellant was $94,530 in debt. During her testimony, she identified an engagement ring as the one that appellant had purchased for her, in her presence. When the police searched appellant's car, a receipt for that engagement ring, valued at $11,500 and dated 13 October 1997, was found in the car. The State proceeded on the theory that appellant killed Drake because he was heavily in debt and was the beneficiary on her insurance policy. In

---

4. As of trial, Frank had been a member of the Baltimore City Sheriff's Department for twenty-three years.

support of its theory, the State offered the testimony of James Dick, an insurance agent who recalled that he first met appellant with the victim during the second week in April of 1996. At that time, appellant purchased a life insurance policy with a $100,000 spouse rider for the victim, who was listed as his common-law wife. Appellant was the victim's beneficiary, and appellant's mother was the contingent beneficiary. On 5 February 1998, appellant met with Dick alone, to set up an IRA, with his daughter as beneficiary. Dick further testified that, following the victim's death, he processed appellant's claim for benefits, which appellant requested as a lump sum. On 21 June 1998, the policy was terminated for lapse of payment. Police found the policy on a table in appellant's apartment.

After his arrest, appellant was held in the Baltimore City Jail, in a cell adjacent to the one occupied by Sean Williams, who was incarcerated for possession of a controlled dangerous substance. On direct examination, Williams admitted that he had a criminal record for various crimes including "unauthorized use, . . . possession of a handgun, . . . theft," and burglary. Williams testified that appellant told him various details of the crime, over "two, three days." According to Williams, appellant admitted that he had taken out a life insurance policy on his fiancée and stood to receive the proceeds; that he and his cousin had gone to the victim's apartment around 3:50 a.m.; that he and the victim had argued; and that he killed the victim for the insurance money because "he [was] in debt, like a $100,000 in debt. . . ." Williams recalled appellant telling him that he had recently purchased a $17,000 engagement ring, and that he had a $3,000 ring in the car when he shot the victim. Williams further testified that appellant said that he had purchased a .22 caliber handgun, the same caliber as the gun linked to the victim's death by forensic evidence. According to Williams, appellant said that he had the receipt when he was arrested, but had given the gun to his cousin for disposal.

Williams testified that, after hearing appellant's confession, he reported it to homicide detectives. After dialing the general information line for the Homicide Division, Williams was connected with Detective Darryl Massey, one of the detectives in charge of the investigation. Williams was then transported to the Homicide Unit, where he gave a recorded statement to Detective Massey. According to Williams, he was promised nothing in exchange for the information. He testified:

[STATE]: Did [Detective Massey] promise you anything?

[WILLIAMS]: No, he didn't.

\*      \*      \*

[STATE]: Did he say he would help you with your pending charges [for CDS possession]?

[WILLIAMS]: No, he didn't.

[STATE]: Has he ever helped you with anything before?

[WILLIAMS]: No, he hasn't.

[STATE]: *So you just did this out of the kindness of your heart?*

[WILLIAMS]: *Yes I did.*

(Emphasis added.)

Williams also denied that "*anyone* from the State's Attorney['s] Office" promised him "anything," as well as that "anyone in the State's Attorney's Office or from the police department initiated any contact" with him "in reference to this case...." According to Williams, he was getting "nothing" "out of all of this...."

On cross-examination, Williams admitted that, in addition to the present case, he had testified in another case in which a defendant had confessed to murder while incarcerated with him. Furthermore, counsel for appellant questioned Williams as to his previous convictions for robbery, drug possession, theft, handgun possession, and unauthorized use. Williams also admitted that he had violated both his parole and his probation. He insisted, however, that he had not sought or received any promises of leniency for his testimony against

appellant. He explained that he testified because he was a "good citizen," "against handguns" and "murders."

In closing argument, the State argued that Williams's testimony was credible and confirmed appellant's guilt. It contended:

> Why did [appellant] talk to Shawn [sic] Williams? I don't know. Why did Shawn [sic] Williams contact Homicide? Was it out of the goodness of his heart? Could have been. Was it because he said he never really hurt anybody? Could have been. Was it because he thought he was going to get something for it? Could have been.
>
> What he did and the information he gave was all corroborated. It fell right in line with everything that was already there.

During deliberation, the jury asked for the recorded interview that Williams had given homicide detectives. The court denied the request because, although the tape was marked for identification, it had not been admitted into evidence.

## B. Facts Pertinent to Post Conviction Hearings

As previously noted, on 10 February 1999, the jury found appellant guilty on all counts. Thereafter, on 21 April 1999, appellant was sentenced to imprisonment for life, plus twenty years. On May 24, 2001, appellant filed a post conviction petition on the basis of newly discovered evidence, contending that the State failed to disclose impeachment information regarding Williams, its key witness, in accordance with *Brady, supra*.[5] The court held hearings on appellant's petition on 1 and 2 May, 17 July, and 26 August 2002. What follows is a summary of the facts adduced at the hearings.

Detective Gerald Hensley, a detective for the Baltimore City Police Department, Eastern District, testified that

---

5. Appellant also included a claim for ineffective assistance of counsel against his trial attorney. The court denied that claim, but he has not appealed from that determination. Accordingly, we do not include a recitation of the facts relating to appellant's ineffective assistance of counsel claim in our factual summary.

Williams had been a paid police informant for the Eastern District drug unit for at least ten years. According to Hensley, from 1991 to 1998, Hensley registered Williams as a confidential informant, gave him a "C.I." number, and paid him a specified, pre-determined amount for information leading to arrests for guns, drugs, or both. He further explained that, in July 1998, Williams had been charged with stealing both a battery and a police cruiser from the police department, Eastern District. Nevertheless, because of his cooperation and value in drug arrests, Williams received "time served" on the battery theft charge and a "stet" on the theft of the police cruiser.

Hensley admitted, however, that confidential informants are not centrally registered; that the Baltimore City Police Department, with more than nine districts, is not computerized; and that, while Hensley was in regular contact with Williams, other detectives and headquarters were not informed of Williams's cooperation and involvement with the police. By way of example, Hensley testified that he was unaware of Williams's assistance in homicide cases, never having conversed with Williams regarding any homicide investigation. According to Hensley, his discussions with Williams were limited to narcotics cases.

Larry Rogers, the Assistant Public Defender who represented Williams in connection with the 1998 burglary and theft charges arising from the police cruiser incident, also testified at the hearings. He explained that Williams had confessed to the theft and faced a seven-year sentence. Rogers also stated that he had obtained information from Detective Hensley about Williams's status as an informant. Rogers corroborated Hensley's testimony that the charges against Williams were stetted in exchange for narcotics information provided by Williams. Rogers testified, however, that no discussion occurred regarding any homicide cases, nor were any offers made to Williams because of his cooperation in any homicide cases.

Gary Shenker, an Assistant State's Attorney in the narcotics division of the Baltimore City State's Attorney's office, had been assigned to the 1998 police cruiser theft case. Testifying for the State in the post conviction proceedings, he said that he knew of Williams's cooperation in narcotics cases and that he had entered the stet because of it. Additionally, he testified that he was aware of the fact that Williams had been given a confidential informant identification number.

Darryl Massey, a detective in the homicide division of the Baltimore City Police Department, testified that Williams provided information regarding two individuals: appellant and Darnel Ratchford. Williams provided the information regarding appellant on 19 March 1998. Massey met with Williams two or three times in connection with appellant's case. According to Massey, Williams never asked for anything in exchange for his statements or testimony, and no offers were made to him by Massey. Massey stated that he did not know that Williams was a paid informant for the police department.

Warren Brown, appellant's trial counsel, recalled that, during discovery, he had requested from the State "any material or information which tends to negate the guilt of the Defendant as to the offense(s) charged, or would tend to reduce the punishment therefor, or would be of assistance in impeaching the credibility of a State's witness." Brown stated that, in response, he received a list of the State's witnesses, which included Williams. Thereafter, Brown learned that Williams had also informed on another defendant in another murder case. Additionally, he learned of Williams's extensive criminal history, his numerous convictions and incarcerations, and his violations of parole and probation.

According to Brown, however, the "sum and substance" of his conversations with the State regarding Williams "was not much of anything." Brown recalled that Lynn Stewart, the Assistant State's Attorney who prosecuted appellant and who is now a judge of the Circuit Court for Baltimore City, had assured him that the State was "not giving him [Williams] anything," and that the State had "no deal with him." Brown

testified that he was unaware that Williams "was being paid to provide information in other cases" or that on 21 May 1998, six months before appellant's trial, "the State had dismissed, had stetted charges relating to theft of a police cruiser as a result of assistance [Williams] provided in narcotics cases."

A copy of the 21 May 1998 notice of postponement in the police cruiser case was admitted into evidence at the post conviction hearing. The postponement indicates that the "defense wishes to cooperate [with the Baltimore City Police Department] and others on pending cases." Brown testified that he had no knowledge of the document at the time of the trial. A copy of the stet in the police cruiser case was also admitted into evidence; it contained a notation from 20 July 1998 indicating: "Stet offered by the State because: State declines to prosecute."

Brown also stated that he had no knowledge of numerous letters written by Williams in 1998 to Judge Allen Schwait, the judge who had sentenced Williams to twenty-one months and five days for possession of cocaine. In those letters, Williams requested leniency for his cooperation with Baltimore City police. The record contains nine letters written between 2 May 1998 and 10 November 1998, in which Williams told Judge Schwait that he was an informant for the Baltimore City Police Department, and made numerous references to his cooperation with both the "prosecutor and Officer Hensley."

Of particular significance, in a letter postmarked 12 August 1998, Williams wrote: "Your Honor, I have been very helpful to officers in Homicide since my arrest, I have told them very important things in cases that are to be tryed [sic] soon. They are Detective Raymond Jones, *Darryl Massey,* William Ritz and others." (Emphasis added.) Moreover, in a letter dated 20 August 1998, he wrote: "Also I have done some work for Detective Darryl Massey, Raymond Jones, Carol Opher and other people in the Homicide Unit. . . ." In that letter, Williams also indicated that the case against him for the theft of a police cruiser had been stetted by State's Attorney Gary Shenker because of his cooperation with the police.

In his letter of 25 October 1998, Williams stated: "I am scheduled to go to trial with Detectives Darryl Massey and Raymond Jones of the homicide division.... They have a murder case due up for trial in November [of 1998] and I am there [sic] key witness." On 5 November 1998, Williams informed Judge Schwait that he had testified that very day "in a murder case on behalf of the State," which "involved a man who killed his fiancée, to obtain a very lump some [sic] of a life insurance."

By letters written on his behalf by his law clerk on 25 September 1998 and 16 October 1998, Judge Schwait responded to Williams. In the letter of 16 October 1998, Judge Schwait directed Williams to have his "attorney contact Detective Hensley and have [his] attorney or the Detective contact this office to inform the Judge of any help you are giving him." Significantly, copies of those letters were also forwarded to the State's Attorney's Office, but not to any particular prosecutor.

Brown noted that this information would have helped him "at trial cross-examining Sean Williams, the jailhouse snitch." He characterized his cross-examination of Williams as "materially weakened" without the information. Brown conceded that ASA Lynn Stewart may not have known of Williams's prior dealings with the police department.

Judge Stewart testified at the post-conviction hearing that she did not make any "offers of leniencies or provide any benefit to Sean Williams in exchange for his testimony in the Tony Williams case." Judge Stewart further stated that she never talked to the prosecutors that were in charge of prosecuting Sean Williams. She also denied having any knowledge that Williams had been charged with stealing a police cruiser, let alone that he received a stet on that charge because of his cooperation in narcotics cases.

At the close of the post conviction hearing of 17 July 2002, the court framed the pertinent issue in the case as follows:

The court is not satisfied that there is any existing Maryland case on this particular factual situation where

there are two prosecutors lets take in the homicide division. [sic] If the court found that one prosecutor knows something[,] does that knowledge bind the other prosecutor ... [t]hat is not on the same case.

Likewise, as to the police in the Eastern District, ... is Det. Hensley's knowledge about Sean Williams and his cooperation such that the state in this case has an obligation whether it knows in fact or not, does it have an obligation to disclose that information? ...

*Does the fact that one prosecutor in the General Felony Division of the Baltimore City State's Attorney's Office, Mr. Shenker, does Mr. Shenker's knowledge extend to a homicide prosecutor in the same office, but in a different location and a different division?*

(Emphasis added.)

By Order dated 24 September 2002, and docketed 25 September 2002, the court denied appellant's petition for post conviction relief. In its accompanying Memorandum Opinion, the court reasoned that the State's duty, under *Brady* and Maryland Rule 4–263(g), did not extend to information held by another prosecutor within the same prosecutor's office who, at all times, was wholly unconnected to the case at issue. The court recognized that it "seems fair and appropriate for the State to be required to disclose to defense counsel all exculpatory information in its hands, including all evidence which goes towards impeachment of a ,State witness, both in its files and the files of the police and of all other agencies who have reported on the case to the State's Attorney's Office and who have participated in the case as part of the prosecution team." Nevertheless, it reasoned that a rule extending the prosecution's disclosure duty to impeachment information known to those who have *never* reported to the prosecution or directly worked on the case would be too broad. The court stated: "[T]his Court does not believe such construction would be appropriate, practical or .would enhance the administration of justice."

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant concedes that neither Lynn Stewart nor the homicide detectives were actually aware, at the time of appellant's trial, of Williams's status as a paid informant for the Baltimore City Police, Eastern Division. The question before us is whether the knowledge of Gary Shenker, a Baltimore City Assistant State's Attorney in the Narcotics Division, and Hensley, a narcotics detective in the Eastern Division, neither of whom had any involvement in the homicide action against appellant, may be imputed to Assistant State's Attorney Stewart. If so, then the State's failure to disclose Williams's status as a paid informant may constitute a *Brady* violation, if such evidence was material.

Appellant contends that, under *Brady*, "the State is obligated to, at the very least, disclose information known within the same prosecutor's office relating to the credibility of the State's witnesses." He asserts "that a prosecutor's disclosure obligations extend beyond the knowledge of the particular prosecutor assigned to a case and include information known to the prosecutor's colleagues in the same office, even if such knowledge is acquired in the course of prosecution of other cases." 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. According to appellant, because Assistant State's Attorney Shenker worked in the same prosecutor's office as then-Assistant State's Attorney Stewart, the State should be charged with Shenker's knowledge, even though Shenker worked in an entirely different division and never worked on the State's prosecution of appellant for homicide.

Appellant also argues that Maryland Rule 4–263(g) "does not limit or qualify the phrase 'State's Attorney and staff members' to attorneys assigned to a particular case—it refers to all such persons, whether assigned to a case or not." Relying on the Nevada Supreme Court decision in *Jimenez v. State,* 112 Nev. 610, 918 P.2d 687, 694 (1996), appellant reasons that " 'the prosecution's duty to disclose exculpatory or impeachment evidence is not limited to situations where the

State admits that it made a deal with an informant specific to the case at hand . . . .'" He urges us to recognize that the court's holding "essentially condones willful blindness by the State of its discovery obligations." According to appellant, because the State relied heavily on Williams's credibility, "it should at the very least be required to perform due diligence within the same prosecutor's office to verify such claims."

As to the materiality prong of the *Brady* analysis, appellant asserts that Williams was the only witness who could "finger him as the shooter." Additionally, appellant notes that no forensic evidence was discovered linking appellant to the homicide. Considering the circumstantial nature of the rest of the State's evidence, appellant asserts that "there is a reasonable probability that the verdict would have been different" if the State had disclosed Williams's status as a paid informant.

Appellant's assertion that Williams was the only witness who could "finger him as the shooter" is not correct. As set forth above, a neighbor of the victim testified that she saw appellant shooting at the victim. Her testimony, however, was self contradictory with respect to what she observed and the sequence of events to such an extent as to cast doubt upon its credibility.

In response, appellee contends that "[n]either [the] United States Supreme Court nor Maryland authority stretches the *Brady* obligation as far as [appellant] claims." According to the State, Md. Rule 4–263(g) "[c]learly limits the discovery obligation to information possessed by those participating in the investigation or prosecution of the action at issue." Echoing the reasoning of the circuit court, the State argues that "limiting the *Brady* disclosure obligation to 'the prosecution team' is reasonable, practical, and consistent with *Brady* principles." Indeed, appellee attacks appellant's reasoning by noting that, in *Jimenez, supra,* "the police officer who failed to disclose what the State claimed to be unrelated benefits given to an informant was part of the prosecution team and testified at the Jiminez trial."

As to the materiality prong, the State contends that the "post conviction court correctly determined that the additional details of Sean Williams's background were simply cumulative to the information already before the jury." Appellee also contends that the information was not material because appellant's trial counsel "thoroughly attacked" Williams's character on cross-examination. Additionally, the State posits: "Evaluated in the context of the entire record, there is no reasonable probability that, with the additional impeachment evidence, the result of Williams's trial would have been any different."

## II.

At the outset, we reiterate that, in reviewing the denial of a *Brady* claim, we are required to accept the factual findings of the post conviction court unless they are clearly erroneous. *Wilson v. State*, 363 Md. 333, 348, 768 A.2d 675 (2001); *Oken v. State*, 343 Md. 256, 296, 681 A.2d 30 (1996), *cert. denied*, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997); *Gilliam v. State*, 331 Md. 651, 672, 629 A.2d 685 (1993), *cert. denied*, 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84 (1994). Under *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, a violation of a defendant's right to constitutional due process occurs whenever the prosecution, whether intentionally or inadvertently, fails to disclose favorable evidence that was material to the defendant's guilt or punishment. In *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, the Supreme Court stated that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Moreover, pursuant to *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), where the reliability of a State witness is determinative of the defendant's guilt or innocence, the State's failure to disclose impeachment evidence also falls within the *Brady* rule. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Conyers v. State*, 367 Md. 571, 598, 790 A.2d 15, *cert. denied*, 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002); *Wilson*, 363 Md. at 346, 768 A.2d 675;

*Ware v. State,* 348 Md. 19, 41, 702 A.2d 699 (1997). The *Brady* rule applies to any exculpatory or impeachment evidence that is material to the defendant's guilt, whether or not the defendant made a request for the evidence. *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Wilson,* 363 Md. at 346, 768 A.2d 675.

In *Conyers,* the Court of Appeals stated that in order to establish a *Brady* violation, appellant must prove

(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material.

367 Md. at 597, 790 A.2d 15 (citations omitted).

The *Conyers* Court explained:

The standard for measuring the materiality of the undisclosed evidence is strictest if it "demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." In *[United States v.] Agurs,* [427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) ] the Supreme Court explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." In cases where there is no false testimony but the prosecution nonetheless fails to disclose favorable evidence, the standard for materiality, in the language of the Supreme Court, is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *[S]ee ... Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[ ]

*Id.* at 598, 790 A.2d 15; *see Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 ("The evidence is material only if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *see also Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555 (1995); *Ware,* 348 Md. at 44–45, 702 A.2d 699.

In *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court explained the materiality standard under *Brady,* in relation to impeachment evidence. The Supreme Court held that impeachment evidence is not material merely because it discredits a witness. *Id.* at 289, 119 S.Ct. 1936. The Court explained: "Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* at 290, 119 S.Ct. 1936 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555).

Maryland Rule 4–263, **Discovery in circuit court,** is also pertinent here. *See* Md. Rule 4–263 (2003). Subsection (g), **Obligations of State's Attorney,** sets forth the discovery obligations of the State's Attorney's Office. It provides, in pertinent part:

> The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney.

We turn now to consider appellant's contentions in support of reversal.

In *Giglio,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, a case heavily relied upon by appellant, the Government offered the testimony of the appellant's co-conspirator. The co-conspirator was the only witness directly linking the defendant with the crime. In its closing argument, the Government told the jury that the co-conspirator had received no promises that he would not be indicted. *Id.* at 152, 92 S.Ct. 763.

In its opposition to appellant's motion for a new trial, the Government admitted that a promise had been made to the co-

conspirator by the Assistant United States Attorney ("AUSA") who had presented the Government's case to the grand jury, but who was no longer involved in the case at the time of trial. According to the AUSA who tried the case, the other assistant had failed to inform him of the promise.

In reversing appellant's conviction and remanding the case for a new trial, the Supreme Court held that, under *Brady*, "The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* at 154, 92 S.Ct. 763 (emphasis added). Of additional significance, the Supreme Court explained: "To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.*

In this case, there is no question but that Williams, a key witness at the murder trial, was a paid police informant who had received leniency on criminal offenses because of his status as an informant; wrote approximately nine letters to Judge Schwait looking for a reduction of his sentence because, *inter alia*, he was going to testify in two murder cases for the State; and lied at appellant's trial about his motives for testifying against appellant, who he said, had confessed to him that he had killed his girlfriend. At least one Assistant State's Attorney, Gary Shenker, knew that Williams was a paid police informant who had received not only money, but also, a stet in the case against him for theft of the police cruiser, in exchange for information in various narcotics cases. Of additional significance, Judge Schwait had forwarded to the State's Attorney's Office his responses to Williams's numerous letters to him. Thus, as the circuit court's memorandum opinion recognizes, the State's Attorney's Office, generally, had been put on notice that Williams was seeking modification of his sentence as a reward for his testimony in homicide cases as well as his cooperation in narcotics cases.

The Ninth Circuit's holding in *United States v. Bernal–Obeso*, 989 F.2d 331 (9th Cir.1993), is illuminating. In that case, the court reversed the appellant's conviction and remanded the case for an evidentiary hearing, after determining that "a material lie by a critical informant-witness about his prior record would be exculpatory and thus discoverable *Brady* information which the government would be under a Constitutional duty to disclose." *Id.* at 336. The court recognized: "By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom." *Id.* at 333. The Ninth Circuit further explained:

> By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility.

*Id.* at 334.

In this case, Assistant State's Attorney Stewart was clearly aware of Williams's past criminal record, and she disclosed that record to appellant's trial counsel. Moreover, she was aware that Williams had telephoned homicide detectives directly from jail in order to inform them of appellant's alleged confession. Although Stewart was unaware that Williams was a *paid* informant, she was aware that he was an incarcerated man who was coming forward with information, allegedly "out of the goodness of his heart." In an article titled *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L.J. 1381, 1394 (June/August 1996), the Honorable Stephen S. Trott cautioned that "[t]he most dangerous informer of all is the jailhouse snitch who claims another prisoner has confessed to him."

We are satisfied that the Ninth Circuit's reasoning in *Bernal–Obeso*, is applicable here. In using Williams as its key witness, the State had a responsibility to "take all reasonable measures to safeguard the system against treachery." 989 F.2d at 334. An explanation by a jailhouse snitch that he is coming forward with the confession of a fellow inmate merely out of the "kindness of [his] heart," should give even the most unseasoned prosecutor pause as to the informant's true motives.

We recognize that, in *United States v. Quinn*, 445 F.2d 940 (2nd Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971), the Second Circuit refused to impute the knowledge of a Florida prosecutor to an AUSA in New York. The court refused to hold that "knowledge of any part of the government is equivalent to knowledge on the part" of the individual prosecutor in the case at issue there. *Id.* at 944 (citation omitted). In this case, however, Gary Shenker, who knew that Williams was a paid police informant who traded information not only for money but also for preferential treatment when he committed crimes, was a prosecutor in the same State's Attorney's Office as Assistant State's Attorney Lynn Stewart. That office had also been put on notice of Williams's status as a professional informant by its receipt of copies of letters from Judge Schwait's office to Williams.

Despite the broad language in *Giglio*, 405 U.S. at 154, 92 S.Ct. 763, to the effect that the "prosecutor's office is an entity and as such it is the spokesman for the Government[;]" that a "promise made by one attorney must be attributed, for these purposes, to the Government[;]" and that "[t]o the extent that this places a burden on the larger prosecution offices, procedures and regulations can be established to carry that burden and to ensure communication of all relevant information on each case to every lawyer who deals with it," it may not be either necessary or practical to hold the prosecution responsible to that standard in every case. Under the circumstances of this case, however, we hold that it is not unreasonable to charge the prosecution with knowledge of impeachment infor-

mation about Sean Williams that, in violation of *Brady v. Maryland*, it failed to divulge to appellant's counsel.

■   When, as here, there is an obvious basis to suspect the motives and credibility of a proposed witness for the State, it may be incumbent upon the State's Attorney, in an office with many Assistant State's Attorneys, to establish a procedure [6] to facilitate compliance with the obligation under *Brady* to disclose to defense material that includes information "casting a shadow on a government witness's credibility[.]"   *See Bernal–Obeso*, 989 F.2d at 334.   Moreover, the police officers who are part of the prosecution team should be required to make some investigation into the background of the jailhouse snitch.

Had *any* procedure for sharing information about *Brady* material been in effect prior to appellant's trial, at least the copies of the letters from Judge Schwait's office to Williams that were sent to the office of the State's Attorney would certainly have triggered an inquiry into Williams's correspondence with Judge Schwait.   This, in turn, would have alerted the prosecutor to Williams's motive in volunteering his testimony about a jailhouse confession.

Having concluded that the State failed in its duty to furnish *Brady* material to the defense, we must next address the issue of materiality.

■   As previously noted, the State contends that, even if we were to find that it should have discovered the information relative to Williams's status as a paid informant, there was still no *Brady* violation because the additional information was cumulative, and consequently, not material.   According to the

---

6.   Perhaps all that is required is a simple intra-office memorandum from the State's Attorney to all members of his or her staff, informing them:

Assistant State's Attorney _____ has been assigned to prosecute _____ for _____ and related offenses, and intends to call as a witness _____, a jailhouse snitch who says that the defendant confessed to him in jail.   If any of you have *any* knowledge about that prospective witness that would tend to cast doubt on his credibility or his motive for testifying, please give that information to the prosecuting attorney so we can comply with our obligation under *Brady v. Maryland*.

State, the information was not material because appellant's trial counsel had "thoroughly attacked" Williams's character on cross examination. We disagree.

In *Conyers*, 367 Md. at 612–14, 790 A.2d 15, the Court of Appeals outlined important factors to assess materiality for purposes of suppressed impeachment evidence. The appellant in that case had been convicted and sentenced to death for first degree murder. He filed a post-conviction petition in which he argued that he was entitled to a new trial because the State had failed to disclose material impeachment evidence concerning its key witness. The impeachment evidence included evidence that the witness sought a benefit in relation to a pending charge when he provided the incriminating information regarding appellant. The appellant also contended that the State committed prosecutorial misconduct by misleading the jury in closing arguments concerning the witness's unselfish motives in coming forward and his credibility as a witness. *Id.* at 583–84, 790 A.2d 15.

The Court concluded that the evidence was material. In so doing, it noted that the witness's testimony provided the " 'only direct link between Petitioner and the crime.' " *Id.* at 613, 790 A.2d 15 (citation omitted); *see also Wilson*, 363 Md. at 353, 768 A.2d 675 (recognizing that the testimony of a codefendant witness provided the "only direct link" between the appellant and the crime). As it does here, the State, in *Conyers*, disputed the appellant's contention that the witness's testimony at trial was the only evidence of the appellant's involvement in the murders. In rejecting the State's claim, the Court acknowledged that "the other evidence to which the State refers is circumstantial."

The Court further explained:

While there was circumstantial evidence adduced during the guilt/innocence portion of the trial that would permit a reasonable jury to conclude that Petitioner was a participant in her murder, it is less apparent that, absent belief of [the State witness's] testimony, the evidence would have been sufficient to find beyond a reasonable doubt, Petitioner was

the principal. If [the State witness's] testimony is to be believed, there are no inferences that need be drawn from the circumstantial evidence ... in order to conclude that Petitioner was involved, or the shooter, in both murders.

*Conyers* at 613, 790 A.2d 15.

For these reasons, the Court held "that the taint of the *Brady* suppression matters on this record so undermines our confidence in the murder convictions and death sentence that a new trial is in order." *Id.*

Similarly, in the present case, Williams's testimony that appellant confessed to the murder of Ms. Drake was the only direct evidence, other than Ms. O'Carroll's apparently confused version of events, linking appellant to the crime. As the post conviction court found, there was no forensic evidence linking appellant to the crime scene and no direct evidence was found linking appellant to the crime as a result of the search of appellant's car or home. In addition, all of the State's other evidence was purely circumstantial, including Fair's testimony that he saw a man running from the building and the evidence relating to the life insurance policy on which appellant was the victim's sole beneficiary. Accordingly, we hold, as did the Court in *Conyers*, "that the taint of the *Brady* suppression matters on this record so undermines our confidence in the murder conviction that a new trial is in order." *Id.* at 613, 790 A.2d 15.

The State further argues that the information is not material because appellant's counsel "thoroughly attacked" Williams's character on cross-examination. The *Conyers* Court rejected an identical argument. There, as it does here, the State argued that "the jury was provided with a 'full picture' of [the State's witness] through the testimony at both trial and the sentencings, referring to vigorous efforts by the [appellant's] lawyers to portray the [witness] as a jailhouse snitch out to get a deal." *Id.* at 614, 790 A.2d 15. The Court was not persuaded, however, that "there would not be a substantial possibility that the outcome would have been different had the withheld information been disclosed." *Id.* at

614, 790 A.2d 15; *see also Wilson,* 363 Md. at 353, 768 A.2d 675 (concluding that appellant's trial counsel's attempt to cross-examine the State's key witness "was far less effective than it would have been had he possessed the written plea agreements.")

The Court's reasoning in *Conyers* is applicable to this case. Appellant's trial counsel cross-examined Williams about his criminal record and his testimony in another homicide case. Nevertheless, counsel had no direct evidence with which to cross-examine Williams as to his receipt of benefits for the information he had provided to police. For these reasons, we cannot say that, if the jury had been informed of the "totality of the circumstances" surrounding Williams's status as a paid police informant and his attempts to have Judge Schwait reduce his sentence because of his cooperation with the police, there would be neither a substantial possibility nor a reasonable probability "that the outcome would have been different." *Id.* at 614, 790 A.2d 15. We agree with the post conviction court's comment that, although appellant's trial counsel's cross-examination of Williams was "nothing short of superb," we believe that it "was far less effective than it would have been" had counsel known of Williams's long-time status as a paid police informant who had received a stet in a prosecution for the theft of a police cruiser in exchange for information in narcotics cases. *Wilson,* 363 Md. at 353, 768 A.2d 675. His cross-examination would certainly have been more effective if he had been aware that Williams was asking a judge for consideration for his testimony in this case.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**