UNITED STATES of America, Plaintiff–Appellee,

v.

Rene BLANCO, Defendant–Appellant.

No. 03–10390.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 2004.

Filed Dec. 27, 2004.

---

Michael K. Powell, Cynthia Hahn, Federal Public Defender, Reno, Nevada, for the defendant-appellant.

Craig S. Denney, Office of the United States Attorney, Reno, Nevada, for the plaintiff-appellee.

Appeal from the United States District Court for the District of Nevada; David W. Hagen, District Judge, Presiding. D.C. No. CR–01–00150–DWH.

Before: T.G. NELSON, W. FLETCHER, and BERZON, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

After a jury trial, Rene Blanco was convicted of various drug crimes. Blanco appeals his conviction on two primary grounds. He contends that the government failed to disclose material impeachment evidence as required by *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). He further contends that a flight instruction should not have been given to the jury.

We hold that the government wrongly suppressed impeachment information about a confidential informant in violation of *Brady* and *Giglio.* We do not know whether there is additional *Brady* and *Giglio* material that the government has still not turned over to the defendant. We remand with instructions to the district court to order the government to reveal all information in its possession concerning the confidential informant. To the degree necessary and appropriate, the district court may inspect this material in camera.

We further hold that the district court erred in giving a flight instruction to the jury, but that this error, considered alone, was harmless.

### I. Background

Defendant Rene Blanco, along with co-defendant Ediberto Alvarez–Farfan ("Alvarez"), was convicted of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(viii), and aiding and abetting the distribution of methamphetamine in violation of 18 U.S.C. § 2.[1]

The government's case depended heavily on the testimony of a paid confidential informant, Pedro Rivera–Barriga ("Rivera"). Rivera is a Mexican national who had previously been in the United States illegally but had received a "special parole visa" in return for his work for the Drug Enforcement Administration ("DEA"). This special visa allowed him to remain in

the country. At the time of his testimony in this case, Rivera had worked as an informant for the DEA in at least ten prior cases.

The government suspected that defendant Blanco was involved in illegal distribution of methamphetamine in Winnemucca, Nevada. At the request of the DEA, Rivera drove to Winnemucca from Phoenix, Arizona, arriving in Winnemucca on September 18, 2001. For the next two or three days, Rivera and DEA agents tried unsuccessfully to locate Blanco. The DEA agents left Winnemucca either on or just before September 21. Rivera testified at trial that he met Blanco on September 21, and that at that meeting they discussed the possibility that Rivera would purchase methamphetamine from Blanco. This conversation was not observed or overheard by any DEA agent and was not recorded.

Rivera testified that he then returned to Phoenix and that Blanco called him there on September 24. Rivera had told DEA agents that Blanco would call him in Phoenix, and that Rivera had arranged to be in the DEA's Phoenix office to receive the call so that it could be recorded. However, Rivera left the DEA office before any call came in. Rivera testified that Blanco called him after he left the DEA office, and that during that call he and Blanco made further arrangements about the sale of methamphetamine. Telephone records were introduced at trial indicating that a call was made from Blanco's phone to Rivera's phone in Phoenix at approximately 6:09 p.m. on September 24. This call was not monitored by DEA agents and was not recorded.

Rivera thereafter returned to Winnemucca. On September 28, Rivera met Blanco in the garage of Blanco's house in

---

1. In a separate appeal, we reversed Alvarez's conviction on a ground not relevant to this appeal. *See United States v. Alvarez–Farfan,* 338 F.3d 1043 (9th Cir.2003).

Winnemucca. Rivera was wearing a wire, and that conversation was recorded. The conversation was entirely in Spanish, and Rivera did most of the talking. At one point during the conversation, Alvarez came into the garage from the yard, where he had been working, to get something to drink. During the course of the conversation, Rivera appears to have arranged with Blanco for a sale later that day of 3/4 of a pound of methamphetamine for $3,750. The recording of the conversation was played for the jury, and a Spanish transcript and English translation were introduced into evidence.

DEA agents set up surveillance cameras and recording devices in the room of the Winnemucca Holiday Inn where the exchange of drugs and money was to take place. Rivera and DEA Agent Don Barnard were in the room when Rivera made and received several telephone calls. All of the calls were conducted in Spanish. Agent Barnard listened to one or more of the calls by putting his ear close to the receiver. Agent Barnard testified, however, that he was "by no means fluent" in Spanish. He had never met Blanco and would not have been able to identify his voice. None of the calls was recorded. No telephone records were introduced at trial indicating whose telephones were used to make these calls. As a result of the calls, the location for the exchange was changed to a room in the local Economy Inn.

Surveillance was difficult at the Economy Inn. Because of the last-minute change of location, it was impossible to set up cameras or recording devices in the room designated for the sale. Further, because of the Economy Inn's layout, none of the surveilling DEA agents was able to see the room. Rivera drove to the Economy Inn in his own car. The car had not been searched by DEA agents since September 21, seven days earlier. Rivera got out of his car, disappeared into the Economy Inn, stayed for a short time, and returned to his car. He appeared to take from the car $3,750 in bills whose serial numbers had previously been recorded by DEA agents. He reentered the Economy Inn, and reemerged a short time later without the money and with about 3/4 of a pound of methamphetamine.

Rivera was wearing a wire while he was at the Economy Inn, but the quality of the recording was so poor that the district court refused to allow the recording or a transcript into evidence. Rivera testified that Alvarez, not Blanco, had delivered the methamphetamine to the Economy Inn. DEA Agent Jerry Craig testified that he had been positioned outside the Economy Inn and that he "believed" he saw Blanco drive past in a car. At this point in the investigation, Agent Craig had only seen a photograph of Blanco. Agent Craig made no written report of this sighting. Rivera testified that Alvarez received a call while they were together in the room at the Economy Inn, and Alvarez told him that the caller was Blanco. Telephone records were introduced at trial indicating that a call was made from Blanco's phone to the Economy Inn at about 3:39 p.m. on that day. None of the surveilling DEA agents saw anyone other than Rivera enter or leave the Economy Inn.

On October 16, wearing a wire, Rivera went to Blanco's house in Winnemucca. He encountered Alvarez, who told him that they had discovered that he worked with the "narcs," and then told him to leave. The recording was played for the jury, and a Spanish transcript and English translation were introduced into evidence. Because of Alvarez's statements to Rivera, the DEA agents concluded that their investigation had been compromised. They

arrested Blanco and Alvarez later that day.

When Alvarez was arrested, he had $80 in his pocket. After Blanco's arrest, the DEA agents obtained a warrant and searched Blanco's house. They found some money, but they found no drugs, no drug paraphernalia, no scales, no ledgers, and no large amounts of money that would have indicated that Blanco conducted a methamphetamine sales operation in his house. No evidence was introduced at trial indicating that the DEA agents compared the serial numbers of the money found on Alvarez and in Blanco's house with the serial numbers of the $3,750 given to Rivera.

Blanco and Alvarez were tried together. Their defense was that Rivera was himself a drug dealer, that Rivera had framed them, that Blanco was not a drug dealer, and that Alvarez was not Blanco's go-between. As is evident from the foregoing narrative, the government's case depended heavily on the jury's believing Rivera's testimony. Conversely, Blanco's defense depended heavily on the jury's believing that Rivera was a liar. The jury returned a verdict of guilty for both Blanco and Alvarez.

Blanco makes two primary arguments on appeal. First, he contends that the government failed to comply with its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Second, he contends that the district court gave an erroneous jury instruction. We consider these arguments in turn.

We review *de novo* an asserted *Brady/Giglio* violation. *United States v. Danielson*, 325 F.3d 1054, 1074(9th Cir. 2003). We review for abuse of discretion a district court's decision to give a jury in-

struction. *United States v. Perkins*, 937 F.2d 1397, 1401 (9th Cir.1991).

## II. *Brady v. Maryland* and *Giglio v. United States*

The government has an obligation under *Brady v. Maryland* to provide exculpatory evidence to a criminal defendant. To establish a *Brady* violation, the evidence must be (1) favorable to the accused because it is either exculpatory or impeachment material; (2) suppressed by the government, either willfully or inadvertently; and (3) material or prejudicial. *Benn v. Lambert*, 283 F.3d 1040, 1052–53 (9th Cir.2002). The government has a duty to disclose *Brady* material even in the absence of a request by the defense. *See Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). For purposes of *Brady*, materiality is measured "in terms of suppressed evidence considered collectively, not item by item." *Id.* at 436, 115 S.Ct. 1555. That is, the reviewing court should assess the "cumulative effect" of the suppressed evidence. *Id.* at 421, 115 S.Ct. 1555.

Impeachment evidence is exculpatory evidence within the meaning of *Brady*. *See Giglio*, 405 U.S. at 154, 92 S.Ct. 763; *see also United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *Brady/Giglio* information includes "material . . . that bears on the credibility of a significant witness in the case." *United States v. Brumel–Alvarez*, 991 F.2d 1452, 1461 (9th Cir.1993), *amending* 976 F.2d 1235 (9th Cir.1992) (quoting *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir.1988)) (alteration in original). Impeachment evidence is favorable *Brady/Giglio* material "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." *Id.* at 1458 (citing *Giglio*, 405 U.S. at 154, 92 S.Ct. 763); *see also United*

*States v. Serv. Deli·Inc.,* 151 F.3d 938, 943 (9th Cir.1998).

 "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart,* 132 F.3d 463, 480 (9th Cir.1997) (en banc). A prosecutor's duty under *Brady* necessarily requires the cooperation of other government agents who might possess *Brady* material. In *United States v. Zuno–Arce,* 44 F.3d 1420 (9th Cir.1995) (as amended), we explained why "it is the government's, not just the prosecutor's, conduct which may give rise to a *Brady* violation." *Id.* at 1427.

> Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor· does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them.

*Id.; see also United States v. Monroe,* 943 F.2d 1007, 1011 n. 2 (9th Cir.1991) (stating that "the prosecution must disclose any [*Brady* ] information within the possession or control of law enforcement personnel") (quoting *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 824 (9th Cir.1985)).

### A. Pretrial Discovery

On October 22, 2001, the government entered into a discovery agreement, a Joint Discovery Statement ("JDS"), with Blanco. The JDS appears to be a standard form used by the United States Attorney's office in Nevada. In relevant part, the JDS provides:

Pursuant to the ruling in *Brady ·v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 that "suppression by the prosecution of evidence favorable to an accused, upon request violates due process where the evidence is material either to guilt or punishment," the Government will disclose before trial any evidence favorable to the defendant which is material to the guilt (or innocence) of the defendant. *Such disclosure is limited to evidence which is known by Government counsel or which could become known by the exercise of due diligence.*

\* \* \*

Pursuant to *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Government will disclose before trial all promises, inducements, or threats made to a witness to gain cooperation in the investigation or prosecution of the defendant as they relate to the case-at bar. *Such disclosure is limited to such evidence which is known by Government counsel or could become known with the exercise of due diligence.*

(Emphases added.) On January 3, 2002, the government entered into a new (but identical) JDS with Blanco, this time signed by Blanco's newly substituted counsel.

On January 8, Blanco's new counsel moved for discovery beyond what the government had already provided. The government made a number of factual representations in its opposition to the motion. In particular, Blanco had asked the government to reveal "[t]he nature of any past or present relationship between any informant" and named federal agencies or "any other federal agency." The government responded simply, "The confidential informant is a DEA informant." The government did not reveal that Rivera had a

significant relationship with the INS, as well as a "special parole visa" from that agency under which he was allowed to stay in this country.

Further, Blanco had asked the government to provide

[a] full and complete statement of *all promises, considerations, rewards, or inducements,* made by the government, its prosecutors, agents or agencies to induce or encourage any witness the government intends to call at trial and who is listed as an informant for any agency of the United States government, wherein the government has agreed to any of the following . . . : . . . To provide favorable treatment or consideration, *including but not limited to,* money, expenses, subsistence, a job, a new location, a new start, etc . . . . in return for that person's testimony, cooperation, or provision of information.

(Emphases added.) The government's response was: "The Government has provided defense with a memorandum from DEA that lists all the payments that were made to the confidential informant. . . . There is no plea bargain with the Government and the confidential informant. . . . There is no . . . agreement [not to charge crimes or enter into a plea agreement] with the confidential informant." The government did not reveal the special parole visa from the INS under which Rivera was allowed to stay in this country in return for his cooperation with the DEA.

On February 8, the district court denied Blanco's discovery motion for failure to comply with a local court rule. On the morning of February 26, the day trial was originally scheduled to begin, the defense complained, "We don't know anything about the confidential informant as this trial starts." The AUSA then disclosed Rivera's name and stated that the delay in disclosure had stemmed from the government's concern for Rivera's safety. For a reason unrelated to the delay in revealing Rivera's name, the court rescheduled the trial for March 6.

On March 22, four days before the trial (which had been rescheduled again), defense counsel asked for information about contracts between the DEA and Rivera: "We've received discovery regarding the confidential informant, but it doesn't include any of the DEA contracts. . . . The DEA contracts establish the quid pro quo to some extent of what the informant is going to receive and what he's expected to do, and I believe that's *Brady–Giglio* material[.]" The Assistant United States Attorney ("AUSA") responded that he understood from his "case agent" that the defense was requesting a "DEA 473" form. The AUSA described the DEA 473 form as an agreement that advises the informant "what he is . . . allowed and what he is prohibited from doing," but does not describe quid pro quo arrangements between an informant and the DEA. The AUSA stated, "I was going to get that information from DEA, and I will turn it over."

On March 25, the day before trial, defense counsel filed a written motion renewing the request for information about contracts between Rivera and the DEA, noting that he had received only "a blank [DEA 473] form from the Government." The motion requested "all forms of promises, inducements and/or deals between the government and its informant[.]" The motion also requested disclosure of "any favors extended by the Government here or in other areas and locations." Finally, the motion specifically requested information about Rivera's immigration status:

The defense knows very little about this informant and does not even know what the individuals [sic] immigration status is at this time or before he was hired by the DEA. Counsel requests any

information which relates to allowance of the informant to remain in the United States. Did the DEA *or any other agency* cause this informant to receive any favorable treatment by immigration.

(Emphasis in original.)

In its opposition to the motion, the government refused to provide the requested information, stating that the material was not relevant and would jeopardize Rivera's safety. The government pointed out that it had "previously provided defense counsel with a memorandum from DEA which detailed the amount of money the informant was paid in this drug investigation" and added that it was "unaware of any 'favors' that defense alleges the informant has received." The government also explained why it had only turned over a blank form: "For policy reasons, the DEA advised the U.S. Attorney's Office that it is unwilling to provide the informant's signed DEA Form 473 until after the informant testifies or the Government is ordered by the Court to provide a signed copy to defense counsel." The government nowhere mentioned Rivera's immigration status in its opposition.

## B. Trial

DEA Agent Barnard was the government's first witness. On direct examination, he described Rivera as "simply" a paid informant:

Q. And there was a confidential source or informant used in this case?

A. Yes.

Q: And based on your training and experience with DEA, are there different types of confidential sources?

A: Yes.

Q: And could you give an example of what—a couple of different types?

A: Confidential informants could be simply doing the work of a—of an informant for money. They could be working as an informant in consideration for sentencing as a defendant.

They could also be working as an informant for a number of different motives, for example, a desire to give back to society, do something that they felt was right.

Q: And the confidential informant used in this case, was he an individual who was working off some type of agreement to help himself for a sentence, or was he just a paid informant.

A: *He was simply a paid informant.*

(Emphasis added.)

However, on cross-examination, in response to a specific question, Agent Barnard admitted that Rivera was an illegal alien who was receiving special treatment from the INS in return for his work for the DEA:

Q: Is Mr. [Rivera] a documented Latino or undocumented?

A: He's undocumented—he's undocumented, however, he has a special parole visa through INS.

Q: Okay. In other words, at some point in time he was suffering the specter of deportation from this country, correct?

[AUSA]: Objection, your Honor.

The Court: Overruled.

A: I can only assume, yes.

I don't know what his INS history or status was prior to my meeting him. I only know that he was paroled, had a special parole visa, public benefit parole visa.

Q: Okay. Well, he was an individual who was suffering from the specter of deportation at the time he began to work for an agency, either Immigration or DEA, or whatever, in order to stay here, fair statement?

A: Yeah. If he's illegal, I guess he's subject to deportation.

Later that day, Rivera took the stand. Before he testified, however, defense counsel stated to the court at a sidebar:

[W]e just heard about immigration consideration that was given to this individual according to Agent Barnard.

We've received so little concerning this person that I don't think that I'm prepared to cross-examine him until I receive some documentation of all that he's received from the United States Government that would cause him possible bias or the desire to please his employers.

He's in this country apparently because of this special immigration parole. We've received no papers on that[.]

The court responded that it would take up this objection at the end of the day.

At the end of the day, after the jury was excused, the district court addressed defense counsel's request for information about past cases in which Rivera had worked for the DEA; about Rivera's immigration status; and about the blank DEA 473 form. The following exchange took place concerning Rivera's prior work for the DEA:

The Court: [I]s the government in a position to attempt overnight, and using perhaps Special Agent Barnard's efforts, to learn the number of agreements this confidential informant has had in the past and the aggregate amount of money he has received from the government over time in all cases?

AUSA: Your Honor, I've talked with the DEA about this issue and their concerns with the informant, even though his identity has been revealed in this case.

Apparently DEA's general counsel's office does not want to even release the information to the U.S. Attorney's Office absent a court order to do so.

I don't know if Agent Barnard would be able to get the information on the past agreements overnight or not. I know that we did provide a memorandum to defense early on totaling the amount of money that Mr. Rivera received, one in reference to this case and then overall a total amount.

(Emphasis added.) The DEA ultimately provided information to the defense that Rivera had worked on a total of ten prior cases, and that information was introduced as evidence.

Concerning Rivera's immigration status, defense counsel stated, "I just happened to get lucky" in cross-examination:

And now we have a little bit about it, but we don't have any documentation, and also we have the clear implication that this person was an illegal alien at the time he entered the country and was given some sort of an agreement that not only engaged him in the process he's now in, but it also got him off the hook for a federal felony.

Now if that isn't *Giglio* information, then I've got the wrong idea about *Giglio* and *Brady*[.]

.... I can't effectively cross-examine this individual basically knowing nothing about him until today.

The district court responded that it thought defense counsel would do "a very good job of cross-examination," and asked for a response from the AUSA.

In response, the AUSA did not refer to Rivera's immigration status, but only to Rivera's DEA 473 form, which he had previously promised to provide:

AUSA: When I contacted DEA, *I was advised by their general counsel that they wouldn't be providing it until after*

*Mr. Rivera would testify because they felt it was a privileged document.* I did manage to get a blank copy so the defendant would see exactly the terms of the agreement[.]

The Court: So you're going to hand them the filled out 473 after his direct examination is concluded?

AUSA: That's correct, your Honor. *That's what I've been advised by the DEA general counsel's office.*

(Emphasis added.) At the end of this exchange, the district court did not order any further discovery.

The next day, Rivera was cross-examined about his immigration status. The following are excerpts from his testimony:

Q: And are you a Mexican citizen?

A: Yes, sir.

Q: And what is your status with the United States?

A: The DEA is in charge of that right now.

\* \* \*

Q: [H]ow are you in the country now?

A: I could be considered illegal.

Q: You didn't get a special parole pass or parole visa through the Immigration Department?

A: Yes, sir.

Rivera then testified that his visa had expired.

Q: [D]id you make the DEA agents that you work with aware that your visa had expired?

A: Yes, sir.

Q: ... Is that what you meant earlier when you said that your immigration status is in the DEA's hands?

A: Yes, sir.

Q: And they haven't given you any green card or any visa papers?

A: Not yet, sir.

Q: Have they promised to make your status legal if you cooperate with them in these investigations?

A: No, sir.

\* \* \*

Q: Your immigration status is not an issue in relation to your working with the DEA?

A: Well, what I know is that they were doing something about my situation, but I haven't received anything yet.

## C. Discussion

█ It is obvious from the foregoing narrative that the government suppressed information that should have been turned over to Blanco under *Brady* and *Giglio*. Any competent lawyer would have known that Rivera's special immigration treatment by the INS and the DEA was highly relevant impeachment material. It is clear from the testimony of Agent Barnard and of Rivera that the DEA was well aware of Rivera's immigration status and the special treatment he was receiving from the INS in return for his work for the DEA. Yet the government failed to disclose this information. Worse, in responding to Blanco's pretrial discovery requests, and in presenting Agent Barnard's testimony on direct examination, the government affirmatively represented that Rivera's sole reward for his work was monetary compensation. Only when asked a specific question on cross-examination did Agent Barnard finally admit that Rivera was "undocumented" and that he had a "special parole visa through INS." Over the objection of the AUSA, Agent Barnard agreed that Rivera was "suffering the specter of deportation," and testified that he was protected by a "public benefit parole visa."

We have encountered a comparable situation once before, in *United States v. Bernal–Obeso,* 989 F.2d 331 (9th Cir.1993). In

that case, the government relied heavily on the testimony of a confidential informant, Cabrera–Diaz, employed by the DEA. Five days after it was required under a court order to provide information about Cabrera–Diaz, and only five days before trial, the government advised the defendant that Cabrera–Diaz had killed two people about ten years earlier, but had not been charged with any crime relating to these deaths. Defense counsel unsuccessfully sought a continuance. *Id.* at 332.

Two days later, defense counsel renewed his request for a continuance, having in the meantime discovered that while the government was right about Cabrera–Diaz having killed two people, it was wrong in almost all other respects. Defense counsel advised the district court that Cabrera–Diaz had indeed been charged with crimes, and had pleaded guilty to two counts of felony manslaughter with a firearm enhancement. The court denied the second request for a continuance. It allowed the defense counsel to impeach Cabrera–Diaz with his convictions, but refused to allow him to question Cabrera–Diaz regarding his apparent lies to the DEA concerning his prior record. *Id.*

Even though the defendant in *Bernal–Obeso* had been able to impeach Cabrera–Diaz at trial with the information about the prior convictions, we refused to perform a harmless error analysis. *Id.* at 333. Instead, we remanded to the district court to determine whether there had been a Confrontation Clause violation, and to determine the full extent of any possible impeachment material under *Brady* and *Giglio*:

> We believe the better course is to flush out the truth from behind the government's veil and then determine what to do with it in the light of its implications, if any, with respect to Cabrera–Diaz's credibility. Moreover, the government

should be required under these circumstances, for prophylactic reasons at least, to demonstrate whether it discharged its obligations under *Brady v. Maryland* and *Giglio* to provide the defense with material exculpatory evidence within the government's possession, including evidence that could have been used to impeach the informant's credibility. . . . [W]e may be dealing with the "tip of an iceberg" of other evidence that should have been revealed. . . . Thus, resolution of this matter is best served by the light of a hearing, not the darkness of an assumption on appeal.

*Id.* (citations omitted).

In this case, some (perhaps many) facts are not yet clear, but the outline of what happened is reasonably apparent. It is clear from the testimony of Agent Barnard that at least one DEA agent knew of Rivera's immigration status and of the "special parole visa" he had been given in return for his work for the DEA. It is also clear from the responses of the AUSA to the district court that the DEA was providing information to the AUSA only reluctantly, and in some instances not at all. Further, it is clear from what the AUSA said to the court that he was dealing directly with the general counsel's office of the DEA, and that decisions not to reveal certain information about Rivera were being made by that office. Finally, it is *not* clear that the AUSA knew, prior to Agent Barnard's testimony on cross-examination, about Rivera's immigration status and his special parole visa. Indeed, it seems likely that the AUSA did not know this information.

■ There is no ambiguity in our law. The obligation under *Brady* and *Giglio* is the obligation of the government, not merely the obligation of the prosecutor. As we wrote in *Zuno–Arce,* "Exculpatory evidence cannot be kept out of the hands

of the defense just because the prosecutor does not have it, where an investigating agency does." 44 F.3d at 1427. The JDS, the form agreement by the United States Attorney's office used in this case, misstates the obligation of the government under *Brady* and *Giglio* when it provides, "Such disclosure [under *Brady* and *Giglio*] is limited to evidence which is known by Government counsel or which could become known by the exercise of due diligence." The government has *not* discharged its obligation if the AUSA ("Government counsel") has exercised due diligence by asking the DEA for all *Brady* and *Giglio* material, and the DEA has refused to provide such information in its possession. To repeat, *Brady* and *Giglio* impose obligations not only on the prosecutor, but on the government as a whole. As we said in *Zuno–Arce,* the DEA cannot undermine *Brady* by keeping exculpatory evidence "out of the prosecutor's hands until the[DEA] decide[s] the prosecutor ought to have it." *Id.* The DEA agents in this case should have known— and the DEA counsel with whom the AUSA conferred almost certainly did know—the extent of the government's *Brady* obligation.

As we did in *Bernal–Obeso,* we remand to the district court for factfinding. As in *Bernal–Obeso,* we have no way of knowing, with the case in its current posture, whether the information that has so far come to light about Rivera is only the "tip of the iceberg." We direct the district court on remand to order the government to produce all files and other information pertaining to Rivera in the possession of the DEA and the INS, as well as any other potentially exculpatory information that the government might have in its possession. Such information includes, but is not limited to, all information pertaining to Rivera's immigration status, his special parole visa, and his work for the DEA in return for consideration relating to his immigration status.

Such information also includes, but is not limited to, all information in the DEA's possession pertaining to all prior cases in which Rivera has worked for the DEA as an informant. We recognize that the government did provide (though belatedly and reluctantly) the number of such prior cases, and that it also provided the total aggregate compensation received by Rivera for his work in these cases. In ordinary circumstances, that amount of information about the prior cases on which Rivera worked might have been sufficient. But the government's suppression of obvious *Brady/Giglio* material has taken this case out of the category of "ordinary circumstances." Given the government's suppression of the *Brady/Giglio* material pertaining to Rivera's immigration status, we believe that "for prophylactic reasons," *Bernal–Obeso,* 989 F.2d at 333, the district court should order full disclosure by the government of any and all potential *Brady/Giglio* material, whether or not related to Rivera's immigration status.[2]

At the government's request, the district court may consider whether to inspect in camera the information produced under its order to ensure the safety of Rivera or other confidential informants, or for other good cause shown. After the district court has reviewed all the information provided, and after it has held whatever hearings it believes appropriate, it will be in a position to decide the appropriate course of action.

2. Our remand to the district court with directions to order the government to produce the above-described information makes it unnecessary for us to reach Blanco's argument that he is entitled to examine Rivera's DEA and INS files under *United States v. Henthorn,* 931 F.2d 29 (9th Cir.1991).

A range of options will be available to the court, including, at one extreme, dismissal of the indictment for governmental misconduct. *See, e.g., United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991) (holding that a district court may dismiss an indictment either to remedy outrageous governmental conduct amounting to a due process violation, or under the court's supervisory powers to remedy a constitutional violation, to protect judicial integrity, or to deter future illegal conduct). At the other extreme, the court could simply leave the judgment of conviction in place. We intimate no view of the appropriate course of action, leaving it in the first instance to the informed judgment of the district court.

### III. Flight Instruction

As recounted above, on October 16, Alvarez confronted Rivera at Blanco's house with the accusation that he worked for the "narcs" and told Rivera to go away. At about 3:00 p.m. that day, Blanco left his house on a motorbike. He rode up to surveilling DEA Agent Gene Bustos, made a 180–degree turn and stopped in front of Agent Bustos's truck, and showed Agent Bustos his middle finger. Blanco then rode off at a high rate of speed. At first, Blanco traveled on paved streets. He then took off into the desert. Agent Bustos chased Blanco in his truck, but was unable to keep up once Blanco rode into the desert. After about fifteen minutes, Blanco returned to his house. DEA agents arrested Blanco sometime later that day.

▮▮▮▮ The government sought and was granted a flight instruction. "Flight instructions are valid only if there is evidence sufficient to support a chain of unbroken inferences from the defendant's behavior to the defendant's guilt of the crime charged." *United States v. Silverman*, 861 F.2d 571, 581 (9th Cir.1988). To meet

this requirement, "four inferences must be justified: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Id.* (internal quotation marks omitted). In determining whether these inferences are warranted, we consider "whether the defendant knew the police suspected him of a particular crime" and "whether the defendant fled immediately after the crime." *United States v. Dixon*, 201 F.3d 1223, 1232(9th Cir.2000). "However, this immediacy requirement generally only becomes important in those cases where the defendant does not know, or his knowledge is doubtful, about the charges and accusations made against him." *United States v. Hernandez–Miranda*, 601 F.2d 1104, 1106 (9th Cir.1979).

▮▮▮▮ We believe that the evidence insufficiently supports the inferences necessary for a flight instruction. It is true that earlier that day Alvarez had confronted Rivera, informing him that they had learned that he was working with the "narcs" and telling him to go away. It is also true that Blanco rode away from Agent Bustos at such a high rate of speed that Agent Bustos was unable to keep up. But Blanco's ride into the desert took place approximately two and a half weeks after the charged crime at the Holiday Inn on September 28, and an indeterminate amount of time after Blanco and Alvarez learned that Rivera worked for the "narcs." *See Silverman*, 861 F.2d at 581("We also consider whether the defendant fled immediately after the crime."); *United States v. Myers*, 550 F.2d 1036, 1051 (5th Cir.1977) ("The more remote in time the alleged flight is from the commission or accusation of an offense, the great-

**396**

er the likelihood that it resulted from something other than feelings of guilt concerning that offense."). Further, there is no evidence that Agent Bustos, or anyone else, tried to detain or arrest Blanco before he rode away, and there is no evidence that Agent Bustos ever signaled for Blanco to stop. Finally, Blanco voluntarily came back to his house about 15 minutes after leaving.

The government states in its brief:

*When DEA agents attempted to arrest Blanco outside of his residence,* Blanco taunted the agents and sped off on his motorcycle [citing Agent Bustos's testimony]. One DEA agent stated that he was following the defendant at speeds of 55–60 mph off the road and the defendant was pulling away from him [again citing Agent Bustos's testimony]. Based on the above sequence of events [including Alvarez's confrontation with Rivera], the defendant's flight created the inference that he was conscious of his guilt in selling drugs to a DEA informant.

(Emphasis added.) If the evidence had been as stated by the government, the flight instruction would have been appropriate. But the government's statement is inconsistent with the evidence.

Agent Bustos (on whom the government relies in its statement) testified that he saw Blanco leave his house on his motorbike, and that he gave chase after Blanco showed him his middle finger and rode away at high speed. But Agent Bustos did not testify that Blanco rode off "[w]hen DEA agents attempted to arrest [him]." Indeed, he said nothing whatsoever about an attempt to arrest Blanco before he rode away. Rather, Agent Bustos testified that Blanco was arrested only after he returned to the house:

Q: At some point, did you decide to stop pursuing him while you were driving in the desert?
A: Yes, I slowed down realizing that I was, you know, driving the vehicle under dangerous conditions, and basically watched his dirt trail disappear.
Q: *At some point later,* did you or the DEA or some other local law enforcement effectuate an arrest of Mr. Blanco?
A: Yes, that's correct.

(Emphasis added.)

 We therefore conclude that giving the flight instruction was error. However, we also conclude that, considered in isolation, the instruction was harmless. *See United States v. Feldman,* 788 F.2d 544, 555–56 (9th Cir.1986) (holding that erroneous flight instruction was harmless when court was "convinced beyond a reasonable doubt that the instruction did not affect the verdict."). The instruction was itself rather mild, containing within it significant cautionary language. It was, in its entirety:

Intentional flight by a defendant after he is suspected of the crime [for] which he is now on trial, may be considered by you in light of all the other evidence in the case. The burden is upon the government to prove intentional flight. Intentional flight after a defendant is accused of a crime is not alone sufficient to conclude that he is guilty. Flight does not create a presumption of guilt. At most, it may provide the basis for an inference of consciousness of guilt. But flight may not always reflect feelings of guilt. Moreover, feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt. In your consideration of the evidence of flight, you should consider that there may be reasons for the defendant's actions that are fully consistent with innocence.

It is up to you as members of the jury to determine whether or not evidence of intentional flight show[s] a consciousness of guilt and the weight or significance to be attached to any such evidence.

Moreover, the evidence of Blanco's "flight"—as provided in Agent Bustos's testimony—was both easily understandable and fairly innocuous. We believe that the jury was unlikely, based on this evidence, to have been misled into attributing to Blanco consciousness of guilt such that it affected the verdict. We therefore find the instructional error, standing alone, harmless. Because we are remanding to the district court for factfinding on the *Brady/Giglio* issue, we do not, at this stage of the proceedings, have occasion to consider the question of cumulative error.

### Conclusion

The government has a duty to "turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility." *Bernal–Obeso,* 989 F.2d at 334. We hold that the government suppressed information that should have been given to Blanco under *Brady* and *Giglio,* and we remand to the district court with directions that it order the government to produce all information in its possession pertaining to Rivera, including but not limited to information about his immigration status and his prior work for the DEA.

We further hold that the district court erred in giving a flight instruction, but that this error, considered alone, was harmless.

We AFFIRM in part and REMAND for further proceedings consistent with this opinion.