BERZON, Circuit Judge,
concurring:
Given the breadth of the district court’s suppression order, the discretion accorded a district court in devising remedies for governmental misconduct, and the positions the defendant has taken before us, the main opinion’s result — affirming Struckman’s conviction — is correct. The defendant makes no attempt to identify anywhere in the record any possible cognizable prejudice to him from the government’s defiance of the court’s discovery order that has not been cured by the suppression order: Struckman disavowed in his brief any trial prejudice and provided no trial transcript on which we could judge such prejudice, complaining in his brief only that the suppressed evidence may have contributed to the indictment. Any such error is harmless at this juncture. See United States v. Mechanik, 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986); United States v. Navarro, 608 F.3d 529, 539-40 (9th Cir.2010); People of the Territory of Guam v. Muna, 999 F.2d 397, 399 (9th Cir.1993); see also United States v. Du Bo, 186 F.3d 1177, 1180 n. 1 (9th Cir.1999). The district court in the order requiring suppression also required that the government “make a proffer before introducing any evidence at trial to *579 establish that the proposed evidence is not derived from the suppressed evidence,” (emphasis added), thereby incorporating a restriction on the use of fruits of “Ted”— derived evidence as well. Moreover, the government did make a lengthy such proffer, Struckman objected to it in detail, and the district court ruled in the government’s favor after a hearing just before trial.
So where are we left? With no showing in the record of prejudice to the defendant and continuing defiance by the government of an order of the district court to produce “Ted’s” identity, after the government prosecutors, knowingly or not, repeatedly provided false information to the court and then defied requests to provide sworn-to information about “Ted’s” identity. We still don’t know who or what “Ted” is. Struckman’s posit was and is that an illegal wiretap must have been involved, and the evidence from Struck-man’s daughter and former wife registers a similar concern. As far as I can tell, the government has not specifically denied any such activity. Nor has the government in this appeal contested the district court’s finding that “Ted’s” full identity remains unknown. So the district court’s finding that the government has still not told the whole story stands. Given that, and given the history in this case of government disavowals of previous assurances regarding the sources of information, the truth of the matter is left up in the air, whether that truth is that there was an illegal wiretap or that there were one or more other informants. And all of this occurred after the district court, relying on Roviaro v. United States, 353 U.S. 53, 59-62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), concluded that Struckman had made a minimal threshold showing that the identity of “Ted” could be relevant to Struckman’s defense of governmental misconduct which, if proven, could have led to dismissal at that juncture. That finding of the degree of potential prejudice necessary to require revelation of the sources of information has not been contested by the government on this appeal either.
To me, this is an intolerable situation, severely challenging the integrity of the courts and the appearance of justice, and so requires further inquiry on remand before we may lay this case to rest. The district court tailored its remedy for the government’s behavior based on the constitutional violation under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that could otherwise have resulted at trial, treating this case as a traditional Brady claim in which the information withheld by the government is actually discovered. But the separate governmental misconduct that occurred in court and has continued to occur — the government’s continuing defiance of the trial court’s discovery orders — has never been remedied, either by insistence on pain of contempt that the government reveal its additional sources after it was determined that it had not done so or otherwise.
I would, therefore, remand for the district court to order the government to reveal the full source of the information attributed to “Ted,” in light of the district court’s now-final finding that Moritz was not the sole source.[1] Only when this infor *580 mation is available can the district court, and we, accurately determine whether a further remedy, in addition to the suppression order, is appropriate. Should the government refuse to disclose the true source of information attributed to “Ted” on remand, I would instruct the district court to consider separately the appropriate remedy for the ongoing affront to the judiciary. I explain briefly below why I would proceed in this way.
A.
Here, in review, are the facts pertinent to my concern: Struckman sought to identify “Ted” before trial, arguing “that unless [Ted] is in a very close relationship with defendant, the government would not have been able to obtain such information but for the use of illegal wiretaps.” The government opposed revealing “Ted’s” identity and assured the district court that “Ted” would not testify at trial. Despite the government’s stipulation, and relying on Roviaro v. United States, 353 U.S. at 59-61, 77 S.Ct. 623, the district court concluded that Struckman had made a minimal threshold showing that the identity of “Ted” could be relevant to Struckman’s argument that governmental misconduct required dismissal.
Roviaro is the seminal case in which the Supreme Court held that “[w]here the disclosure of an informer’s identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the [government’s] privilege[to withhold the informer’s identity] must give way.” Id. at 60-61, 77 S.Ct. 623. Moreover, if the government does not comply with a disclosxire order, “the trial court ... may dismiss the action.” Id. at 61, 77 S.Ct. 623 (emphasis added). Roviaro was not decided “on the basis of constitutional claims,” but subsequent Supreme Court and Ninth Circuit case law makes clear that due process concerns undergird the Roviaro requirement. United States v. Valenzuela-Bernal, 458 U.S. 858, 870, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (citing McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967)); see also United States v. Gonzalo Beltran, 915 F.2d 487, 488-89 (9th Cir.1990). Roviaro does not establish any “absolute rule requiring disclosure of an informer’s identity,” McCray, 386 U.S. at 311, 87 S.Ct. 1056, and does require a showing of materiality of the identity information, although, as the district court here noted, a relatively minimal one, given the fact that the defendant does not know the identity of the informant. See Valenzuela-Bernal, 458 U.S. at 871, 102 S.Ct. 3440.
As noted, the district court here found that there was an adequate matex-iality showing to require in camera identification of the source for the information attributed to “Ted,” and the government has not challenged that conclusion on appeal. To assess Roviaro claims, a trial court must “balanc[e] the public interest in protecting the flow of information against the individual’s right to prepare his defense.” Roviaro, 353 U.S. at 62, 77 S.Ct. 623. The district court attempted to engage in Roviaro balancing by ordering the government to produce “Ted” for an in camera hearing. But no useful hearing with the man identified as “Ted” ever came to pass. The distinct court ultimately found that IRS agents lied about Gary Moritz being the sole source of the information attributed to “Ted,” and affirmatively found that the court could not engage usefully in Ro *581 viaro balancing as a result. We are, then, obliged to go forward on the premises that (1) some of the information attributed to the identified informant had a different, still unknown source, whether a different, unknown individual or, as Struckman suggests, a wiretap; (2) the IRS agents, at least, lied about the source of some of the information attributed to “Ted”; and (3) although it has not been determined whether the prosecutors were complicit in the misrepresentations regarding “Ted,” they failed twice to submit statements under penalty of perjury from the government agents although repeatedly directed by the court to do so, providing some indication that they were at least troubled about whether those agents were telling the truth.
Indubitably, this misbehavior of the government agents and perhaps of the prosecutors affirmatively prevented the district court from carrying out the required Roviaro balancing. For, unlike in cases such as Roviaro and Valenzuela-Bernal[2] — the need for the continuing use of the same informants in Roviaro, the strong interest in deporting illegal immigrants in Valenzuela-Bemal — the government has proffered no competing governmental interest in this case at all in justification of its refusal to comply with the discovery order.
The district court so recognized, and held “that by suppressing the source of the information attributed to AI-l/Ted, information that would be material to a defense of governmental misconduct, the government ha[d] committed a Brady violation that would result in a due process violation at trial.”[3] Yet, without additional discussion, the district court determined that “the taint of the violation c[ould] be neutralized by excluding any evidence attributed to AI-l/Ted at trial” unless the government “showfed] an independent source for the information” and also by requiring the government to make “a proffer before introducing any evidence at trial to establish that the proposed evidence [was] not derived from the suppressed evidence.” Although Roviaro, as noted, authorizes dismissal in similar circumstances, the district court declined to dismiss the indictment, viewing the broad suppression order as adequate for the due process violation. But there was no separate, explicit discussion in the district court’s order of the continued refusal to reveal the full identity of “Ted” or of whether additional sanction was merited under the court’s supervisory powers — as opposed to under the due process clause — on account of that continued refusal.[4]
B.
I have been able to find no case similar to this one, in which a broad, pretrial suppression order adequately remedied any due process violation to the defendant,[5] but the governmental defiance of a *582 court order remained entirely unremedied. I am uncomfortable leaving this affront to the court’s integrity and to the appearance of justice unaddressed.
We have recognized that investigatory misconduct can be the basis of a dismissal under our supervisory powers. For example, in United States v. Blanco, this Court held that the government had not discharged its Brady/Giglio obligations when the Drug Enforcement Administration refused to disclose the specifics of a deal with an informant, even to the Assistant U.S. Attorney prosecuting the case, until after the informant had testified at trial. 392 F.3d 382, 392-94 (9th Cir.2004). We remanded to the district court with instructions to order the disclosure of all Brady/Giglio materials and to conduct additional hearings as appropriate. Id. at 394. We noted that upon remand, “[a] range of options w[ould] be available to the court, including, at one extreme, dismissal of the indictment for governmental misconduct.” Id. at 395. Thus, Blanco clearly contemplates that a government agency’s refusal to comply with discovery obligations as ordered by a district court might warrant dismissal, even when the prosecutor is kept in the dark.
Moreover, even if we focus only on the prosecutors’ actions in this case, “unintentional misconduct may be sufficient” to warrant dismissal of an indictment for “flagrant cases of prosecutorial misconduct.” See United States v. De Rosa, 783 F.2d 1401, 1406 (9th Cir.1986). Here, the prosecutors at a minimum failed to come forward with declarations under penalty of perjury when asked; even if one supposes that it was the agents who refused to provide the sworn statements, that refusal should have put the prosecutors on notice that there was a problem and led to a report to the court, rather than repeated recalcitrance in the face of a court order. So even if we generously describe the prosecutors’ actions as “unintentional,” dismissal might still have been an appropriate remedy if there was prejudice to Struekman.
But, for obvious reasons — primarily, avoiding a windfall to the defendant as well as the affront to the public interests underlying the criminal law — our case law requires that even under our supervisory powers, we may dismiss a case as a sanction for governmental misconduct only if a defendant can show prejudice to himself as a result of the misconduct. See United States v. Chapman, 524 F.3d 1073, 1077, 1087 (9th Cir.2008); United States v. Barrera-Moreno, 951 F.2d 1089, 1093 (9th Cir. 1991). As I have said, on appeal Struck-man makes no attempt to demonstrate that he suffered cognizable prejudice after the district court’s order.
So the question remains what remedy will be available on remand after a demand is made for the concealed information? [6] Should the government come forward with information regarding illegal activity underlying the information attributed to “Ted,” there might be sanctions attached to that activity. Also, Struckman or any *583 one else affected might have legal recourse with regard to any concealed illegal activity, once it is exposed.
Should the government continue to refuse on remand to come forward with the full source of the information attributed to “Ted,” I would think that personal sanctions against the offending government agents and, if appropriate, the prosecutors would be available, including a criminal contempt inquiry for “[disobedience ... to [the court’s] lawful ... order.” 18 U.S.C. § 401; see also United States v. Galin, 222 F.3d 1123, 1127-28 (9th Cir.2000). Further, a judicial referral to both the Department of Justice and the Department of the Treasury for discipline of the individuals involved would also be appropriate. And there may be other alternatives, such as barring the individuals involved from appearance in the district court as witnesses or prosecutors in other cases.
I do not think it our role at this point to determine the precise remedies available, as we do not know what further inquiry will show. But I do think that, even after affirming the conviction, we should not leave matters as they are with regard to the continuing defiance — continued in this court as well — of the valid order that the informant’s identity be revealed.
I therefore concur in the opinion, except that I would remand for the purpose stated.

. As Judge Takasugi has since passed away, I understand that this case would need to be remanded to a new district court judge. Also, as the defendant is unlikely to wish to carry on once his conviction is affirmed, it would probably be necessary to appoint a special counsel for purposes of pursuing the remand proceedings I suggest. (If criminal contempt is pursued, a prosecutor, either for the government or appointed specially by the court, would be mandatory as to conduct occurring outside the court’s presence. See Fed. *580 R.Crim. Proc. 42(a); see also Aradia Women’s Health Ctr. v. Operation Rescue, 929 F.2d 530, 532 (9th Cir.1991).)

. In Valenzuela-Bemal, the Supreme Court relied on Brady to hold that deportation of witnesses violates a defendant's due process rights when "the evidence lost [by their deportation] would be both material and favorable to the defense." 458 U.S. at 873, 102 S.Ct. 3440; see also id. at 867-68, 102 S.Ct. 3440.

. I view Roviaro, albeit decided earlier, as prescribing essentially a subrule under Brady for informant situations, with the caveat that where the defendant knows there has been an informant but has not had access to the identity of the informant or information provided by him, the prejudice standard operates somewhat more flexibly.

. Struckman argued in the district court and argues here that the discovery violations justified dismissal under the court’s supervisory powers.

. The suppression order would not technically have remedied any due process violation arising if a trial witness who was the source of *582 the information attributed to "Ted” testified about something not attributed to "Ted.” In that instance, it is possible that the true circumstances underlying the "Ted” information could have yielded cross-examination material — for example, if illegal acts were performed to obtain that information, or if the informant had a secret deal with the government covering both the "Ted” information and the information testified to. But without the trial transcript, we can't tell whether this scenario is even hypothetically possible.

. On remand, the district court may of course provide that the government first divulge such information in camera to protect the identities of any real informants from whom information attributed to "Ted” was obtained.